**EXHIBIT B**

No.

# In the Supreme Court of the United States

———————

UNITED STATES OF AMERICA, PETITIONER

*v.*

TODD NEWMAN AND ANTHONY CHIASSON

———————

*ON PETITION FOR A WRIT OF CERTIORARI*
*TO THE UNITED STATES COURT OF APPEALS*
*FOR THE SECOND CIRCUIT*

———————

**PETITION FOR A WRIT OF CERTIORARI**

———————

DONALD B. VERRILLI, JR.
*Solicitor General*
  *Counsel of Record*
LESLIE R. CALDWELL
  *Assistant Attorney General*
MICHAEL R. DREEBEN
  *Deputy Solicitor General*
ELAINE J. GOLDENBERG
  *Assistant to the Solicitor*
  *General*
ROSS B. GOLDMAN
  *Attorney*

  *Department of Justice*
  *Washington, D.C. 20530-0001*
  *SupremeCtBriefs@usdoj.gov*
  *(202) 514-2217*

## QUESTION PRESENTED

In *Dirks* v. *SEC*, 463 U.S. 646 (1983), this Court held that a corporate insider breaches his fiduciary duty and subjects himself to insider-trading liability when he personally benefits from the selective disclosure of material, nonpublic information for securities trading—including when he "makes a gift of confidential information to a trading relative or friend." *Id.* at 664. "The tip and trade," the Court explained, "resemble trading by the insider himself followed by a gift of profits to the recipient." *Ibid.*

The question presented is whether the court of appeals erroneously departed from this Court's decision in *Dirks* by holding that liability under a gifting theory requires "proof of a meaningfully close personal relationship that generates an exchange that is objective, consequential, and represents at least a potential gain of a pecuniary or similarly valuable nature."

(I)

## PARTIES TO THE PROCEEDING

Petitioner is the United States of America, which was appellee in the court of appeals. Respondents are Todd Newman and Anthony Chiasson, who were appellants in the court of appeals.[*]

---

[*] The Second Circuit caption includes four individuals who were defendants in the district court: Jon Horvath, Danny Kuo, Hyung G. Lim, and Michael Steinberg. Those individuals are not "parties to the proceeding in the court whose judgment is sought to be reviewed" under Rule 12.6. They did not participate in that proceeding, and the caption makes clear that they were neither appellants nor appellees. See App., *infra*, 1a.

**TABLE OF CONTENTS**

Page

Opinion below ...................................................................1
Jurisdiction .......................................................................1
Statutory and regulatory provisions involved ...........................2
Statement..........................................................................2
Reasons for granting the petition.........................................14
   A.  The Second Circuit's decision conflicts with this
       Court's decision in *Dirks* v. *SEC*....................................15
   B.  The Second Circuit's decision conflicts with
       decisions of other courts of appeals ................................22
   C.  The Second Circuit's erroneous redefinition of
       personal benefit will harm the fair and efficient
       operation of the securities markets and warrants
       review.......................................................................25
Conclusion.......................................................................34
Appendix A — Court of appeals opinion (Dec. 14, 2014).......1a
Appendix B — Court of appeals order .................................35a
Appendix C — Statutory and regulatory provisions ...........37a

**TABLE OF AUTHORITIES**

Cases:

   *Bateman Eichler, Hill Richards, Inc.* v. *Berner*,
     472 U.S. 299 (1985) .............................................17
   *Cady, Roberts & Co., In re*, 40 SEC 907 (1961)..................22
   *Chadbourne & Parke LLP* v. *Troice*, 134 S. Ct. 1058
     (2014) ...................................................................26
   *Chiarella* v. *United States*, 445 U.S. 222 (1980) .................26
   *DeMarco* v. *Lehman Bros., Inc.*, 222 F.R.D. 243
     (S.D.N.Y. 2004) ....................................................28
   *Dirks* v. *SEC*, 463 U.S. 646 (1983) ..........................*passim*
   *Jackson* v. *Virginia*, 443 U.S. 307 (1979) ............................2
   *Morrison* v. *National Australia Bank Ltd.*, 561 U.S.
     247 (2010) .............................................................33

(III)

IV

Cases—Continued:                                          Page

*SEC* v. *Maio*, 51 F.3d 623 (7th Cir. 1995)...........22, 24, 25, 32

*SEC* v. *Payton*, No. 14 Civ. 4644, 2015 WL 1538454
    (S.D.N.Y. Apr. 6, 2015) ......................................................19

*SEC* v. *Rocklage*, 470 F.3d 1 (1st Cir. 2006).........................23

*SEC* v. *Yun*, 327 F.3d 1263 (11th Cir. 2003)........................23

*Stoneridge Inv. Partners, LLC* v. *Scientific-Atlanta,*
    *Inc.*, 552 U.S. 148 (2008) .....................................................27

*United States* v. *Conradt*, No. 12 cr 887, 2015 WL
    480419 (S.D.N.Y. Jan. 22, 2015)...........................................32

*United States* v. *Evans*, 486 F.3d 315 (7th Cir.),
    cert. denied 552 U.S. 1050 (2007)......................................24

*United States* v. *Jiau*, 734 F.3d 147 (2d Cir. 2013),
    cert. denied, 135 S. Ct. 311 (2014) ...............................11, 12

*United States* v. *Naftalin*, 441 U.S. 768 (1979) ..................27

*United States* v. *O'Hagan*, 521 U.S. 642
    (1997) ...............................................................15, 25, 26, 27

*United States* v. *Salman*, No. 14-10204, 2015 WL
    4068903 (9th Cir. July 6, 2015)...............................19, 22, 23

Statutes and regulation:

Securities Exchange Act of 1934, 15 U.S.C. 78a
  *et seq.*:
      15 U.S.C. 78j ......................................................................2
      15 U.S.C. 78j(b) (§ 10(b))............................................2, 15
      15 U.S.C. 78t(b) ................................................................16
      15 U.S.C. 78ff ....................................................................2
    18 U.S.C. 2 ..............................................................................2
    18 U.S.C. 371 ..........................................................................2

V

Regulations—Continued:                                    Page

  17 C.F.R.:

      Section 240.10b-5.................................................2, 15

      Section 240.10b5-2.................................................2

Miscellaneous:

  CFA Institute, *Code of Ethics and Professional Conduct* (June 2014), http://www.cfapubs.org/doi/pdf/10.2469/ccb.v2014.n6.1...................................................28

  James D. Cox, *Giving Tippers a Pass*:  U.S. v. Newman (Jan. 27, 2015), http://clsbluesky.law.columbia.edu/2015/ 01/27/giving-tippers-a-pass-u-s-v-newman-3/..........................................................33

  Melvin Avon Eisenberg & James D Cox, *Business Organizations* (11th ed. 2014) .............................33

  *Federal Judicial Caseload Statistics*, http://www.uscourts.gov/statistics-reports/analysis-reports/federal-judicial-caseload-statistics (last visited July 20, 2015) ....................................33

  18 Donald C. Langevoort, *Insider Trading Regulation, Enforcement, and Prevention* (2006) .......................18

  Michael Perino, *The Gift of Inside Information*, (Dec. 12, 2014), http://dealbook.nytimes.com/2014/12/12/the-gift-of-inside-information/..................................25

  Ben Protess & Matthew Goldstein, *Appeals Court Deals Setback to Crackdown on Insider Trading*, N.Y. Times (Dec. 11, 2014) ...................................25

  Stephanie Russell-Kraft, *2nd Circ. Invites Insiders to Save the Tips for Friends*, Law360 (Dec. 18, 2014), http://www.law360.com/articles/605913 .................25

VI

Miscellaneous—Continued:                        Page

Dan Stroh, *Murking* Dirks: *Personal Benefits in
    Insider Trading Violations*, Univ. of Cincinnati L.
    Rev. Blog (Mar. 10, 2015), http://uclawreview.org/
    2015/03/10...............................................................26

*Webster's New International Dictionary*
    (2d ed. 1958)..........................................................19

# In the Supreme Court of the United States

————

No.

UNITED STATES OF AMERICA, PETITIONER

*v.*

TODD NEWMAN AND ANTHONY CHIASSON

————

*ON PETITION FOR A WRIT OF CERTIORARI*
*TO THE UNITED STATES COURT OF APPEALS*
*FOR THE SECOND CIRCUIT*

————

**PETITION FOR A WRIT OF CERTIORARI**

————

The Solicitor General, on behalf of the United States, respectfully petitions for a writ of certiorari to review the judgment of the United States Court of Appeals for the Second Circuit.

**OPINION BELOW**

The opinion of the court of appeals (App., *infra*, 1a-34a) is reported at 773 F.3d 438.

**JURISDICTION**

The judgment of the court of appeals was entered on December 10, 2014.  A timely petition for rehearing was denied on April 3, 2015 (App., *infra*, 35a-36a).  On June 16, 2015, Justice Ginsburg extended the time within which to file a petition for a writ of certiorari to and including Saturday, August 1, 2015.  This Court's jurisdiction is invoked under 28 U.S.C. 1254(1).

(1)

2

## STATUTORY AND REGULATORY PROVISIONS INVOLVED

The relevant provisions (15 U.S.C. 78j and 78ff, 18 U.S.C. 2 and 371, and 17 C.F.R. 240.10b-5 and 240.10b5-2) are reproduced in the appendix to this petition. App., *infra*, 37a-44a.

## STATEMENT

Following a jury trial in the United States District Court for the Southern District of New York, respondents Todd Newman and Anthony Chiasson were convicted of conspiracy to commit securities fraud, in violation of 18 U.S.C. 371, and securities fraud, in violation of 15 U.S.C. 78j(b) and 15 U.S.C. 78ff.  See App., *infra*, 2a, 4a.  The district court sentenced respondent Newman to 54 months of imprisonment and respondent Chiasson to 78 months of imprisonment, with both sentences to be followed by one year of supervised release.  See *id.* at 8a; see also *ibid.* (court also imposed fines and forfeitures).  The court of appeals reversed the convictions and remanded for the district court to dismiss the indictment with prejudice as to respondents.  See *id.* at 3a.

1. The evidence at trial, taken in the light most favorable to the jury's guilty verdict, see *Jackson* v. *Virginia*, 443 U.S. 307, 319 (1979), established that respondents—both of whom worked as hedge-fund managers, see App., *infra*, 2a—were part of a scheme in which a circle of market analysts repeatedly obtained material, nonpublic information from employees of publicly traded technology companies and shared that information with each other and their superiors.  The information, much of which related to confidential quarterly earnings reports that were on the verge of being finalized and made public, gave the

3

recipients advance knowledge of "whether [the companies'] earnings were going to be materially better or worse than market expectations[,]" thus "allowing for trading on the stock." Tr. 156. Respondents used the information as a basis for trades in securities of Dell, Inc. and NVIDIA Corporation, thereby earning approximately $4 million for respondent Newman's fund and approximately $68 million for respondent Chiasson's fund. See App., *infra*, 4a; see also Tr. 2662-2666 (Chiasson heavily invested in his fund and received substantial percentage of its profits).

a. *Dell*. The insider at Dell was Rob Ray, who worked in the investor-relations department and then moved to the corporate-development department. See App., *infra*, 5a; Tr. 2759, 2867. Ray had access to specific information on Dell's quarterly earnings—information that under Dell policy was to remain strictly confidential until Dell made a public earnings announcement. See Tr. 2766-2778, 2805-2816; Exs. 1707, 1712, 1730; see also Tr. 342, 2926.[1] Despite that policy, Ray provided detailed, pre-announcement earnings information to Sandy Goyal, an analyst at Neuberger Berman (and former Dell employee), in multiple successive quarters. See Tr. 150-156, 1390, 1410-1421. For instance, Ray told Goyal in August 2008—after the close of the quarter but before the earnings announcement—that gross margin was "looking at 17.5%" versus market expectations of 18.3%. See Tr. 239-249; Exs. 90, 214.

When Goyal wanted to speak to Dell's investor-relations department, he had authorized contacts other than Ray with whom he generally communicated

---

[1] Cites to "Ex." refer to the government's trial exhibits.

4

during business hours. See Tr. 1472-1475, 1631; Exs. 736, 759. In contrast, the conversations in which Ray provided Goyal with material, nonpublic information typically took place at night or on weekends, when Ray was away from his work cubicle and could not be overheard by his colleagues. See Tr. 1630-1631, 2924, 2966-2972; Exs. 26-27; see also, *e.g.*, Tr. 1465, 2867 (tips continued after Ray left investor-relations department, when he had no legitimate basis for speaking to an analyst about Dell).

Goyal obtained access to information that was otherwise shielded from outsiders' view because he was friendly with Ray, and because he had something that Ray badly wanted. When the tips began, Ray and Goyal "had known each other for years," having attended business school together and "worked at Dell together." App., *infra*, 24a-25a. Over the course of their relationship, they met each other's wives, had dinner together, talked about going on joint vacations, and frequently had lengthy phone conversations. See Tr. 1390-1391, 1411-1412, 1468-1470, 1628-1630. And once Goyal left Dell and began working in a more lucrative position as an analyst, Ray made clear that he "desperately" wanted to make a similar move and desired Goyal's help in doing so. Ex. 708, at 2; see, *e.g.*, App., *infra*, 25a; Tr. 1391-1403, 1413-1415, 1444-1450.

Goyal obliged him, "advis[ing] Ray on a range of topics, from discussing the qualifying examination in order to become a financial analyst to editing Ray's résumé and sending it to a Wall Street recruiter." App., *infra*, 25a. Ray never explicitly said that the tips about Dell's performance were intended to encourage Goyal to continue that kind of assistance, see

5

Tr. 1514, and Goyal asserted at trial that he would have kept giving "some kind of advice" absent the tips, Tr. 1515. But Goyal explained that his advice would not have had as "much detail," "frequency," or "length" absent the inside information he received, Tr. 1515, and he put "special" effort into helping Ray compared to others: the advice was "very, very detailed for [Ray] and I spent a lot of time, so—I haven't done that with anybody else." Tr. 1515; see Tr. 1630. Often, the advice and the tips were also temporally linked: on August 14, 2008, for example, Goyal emailed Ray an investment pitch for Ray to use in job interviews, and Ray tipped Goyal. See Tr. 267-268, 1457-1462; Exs. 39, 222-225, 733-734.

When Ray gave Goyal inside information, Goyal shared it with an analyst at the Diamondback hedge fund named Jesse Tortora. App., *infra*, 5a; see Tr. 1630, 1640 (Goyal was "paid for [the information]" by Tortora). Tortora then relayed the information to respondent Newman (his manager) and to other analysts, including an analyst at the Level Global hedge fund named Spyridon Adondakis. Adondakis, in turn, provided the information to respondent Chiasson (his superior at Level Global). See App., *infra*, 5a. Both respondents executed lucrative trades in Dell stock based on those tips. See *id.* at 4a; Exs. 51, 56, 59, 64.

Respondents had ample reason to conclude that the Dell information came from insiders who disclosed it for personal reasons rather than to advance the interests of Dell or its shareholders. As for respondent Newman, Tortora told him that the Dell tips came from Goyal and that Goyal had a source inside Dell, see Tr. 158-161, and Newman knew that the Dell insider did the tipping at nights and on weekends rather

6

than during normal business hours.  See Exs. 197, 242, 322.  The specific earnings-related numbers that Newman was obtaining—which sometimes differed markedly from "street" expectations, see, *e.g.*, Ex. 214, and which he therefore eagerly sought out, see, *e.g.*, Ex. 228, 287—were distinct from anything that might have trickled out from the company in the normal course in advance of a public announcement.  See, *e.g.*, Tr. 158, 342, 1209-1212, 1416.  Newman therefore made hefty investments in Dell stock on the basis of the tips, including a "very large" short position in August 2008 that earned his fund nearly three million dollars.  See, *e.g.*, Tr. 293-294, 3562-3563; Exs. 50, 58-59, 67; see also Tr. 1197-1200 (referring to a tip, Newman asked "the Dell from Sandy [Goyal]?" and on confirmation began trading shortly thereafter).  And he passed a portion of the profits back down the tipping chain to Goyal, paying Goyal (through payments to his wife, who never did any work for Diamondback) a total of $175,000—an amount approximately equivalent to Goyal's yearly salary—while noting that Goyal "helped us most."  Tr. 404-406; see Tr. 1263, 1353-1354, 1424-1426; see also, *e.g.*, Tr. 1640; Exs. 750-754, 775A, 776, 2270.

As for respondent Chiasson, he learned from Adondakis that the Dell tips came from Goyal, who used to work at Dell and who got the information from "someone within" the company.  Tr. 1708; see Tr. 1757, 1778-1779, 2219.  He knew that the "Dell insider" was giving "final roll-up[s] of numbers" that were "unlikely to change" before the earnings announcement.  Tr. 1792-1793.  Chiasson demonstrated his trust in the reliability of the information by immediately changing his position in Dell stock, ultimately

7

building up a short equity position in excess of $200 million.   See Tr. 1736-1742, 3167-3168; Exs. 62, 319, 2501-LA.  In addition, Chiasson took steps to conceal the source of the information from those outside his trusted circle.  When it was time to record the basis for his trades on an internal reporting system, he instructed Adondakis to create a report for the Dell trades that did not reference "information about contacts."  Tr. 1783-1785, 1790; see p. 9, *infra*.  And when Chiasson told a business acquaintance that he had "checks on [gross margin]" for a particular quarter and the acquaintance inquired how that was possible, Chiasson wrote back:  "Not your concern.  I just do." Tr. 2748; see Ex. 448, at 5.

b. *NVIDIA.*  The insider at NVIDIA was Chris Choi, who worked in NVIDIA's finance unit and had access to the company's quarterly earnings numbers before they were publicly announced. See App., *infra*, 5a; Tr. 3091-3096; Ex. 1958A.  Choi was not authorized to speak with investors about the company's earnings, and NVIDIA policy forbade him (or anyone) from disclosing financial results in advance of a public announcement.  See Tr. 3097-3103; see also Tr. 493-494 & Ex. 803 (NVIDIA's investor-relations head kept tight lid on information).

Nevertheless, for more than two years, Choi provided confidential, pre-announcement NVIDIA earnings information to Hyung Lim, a technology executive.  See App., *infra*, 5a; Tr. 3033-3038.  That information—given quarter after quarter—was highly detailed.  See Tr. 3034-3037, 3046-3047.  For instance, on February 9 and 10, 2009, Choi tipped Lim that quarterly revenues would be $481 million and GAAP gross margins would be 29.4 percent; NVIDIA's earn-

8

ings announcement, made later on February 10, closely matched those figures. See Exs. 806, 1975.

Choi was willing to give Lim that kind of informational advantage because Lim was his friend. At the time Choi began tipping Lim, the two men had known each other for more than a decade. See Tr. 3031-3032. They met through church, attended church picnics and other functions together, had lunches together, knew each other's families (for instance, Lim once bought a gift for Choi's child), and spoke by phone. Tr. 3032-3033, 3068; see also App., *infra*, 5a, 25a; Tr. 3010. Choi also knew that Lim traded NVIDIA stock; Lim told him so, and even asked Choi "whether he thinks that I'm going to be able to sell [that stock] for profit." Tr. 3044; see Tr. 3068-3069, 3082-3083.

When Lim received a tip from Choi, Lim provided it to an analyst at Whittier Trust named Danny Kuo, who paid Lim a total of $15,000 for "giving him non-public information" on NVIDIA and other companies. Tr. 3010; see Tr. 3033, 3039-3043 (Kuo wired $5000 to casino to cover Lim's gambling debt), 3054. Kuo then circulated the information to the circle of analysts that included Tortora and Adondakis. See App., *infra*, 5a. Tortora passed the information to respondent Newman, and Adondakis passed it to respondent Chiasson—both of whom executed profitable trades as a result. See *ibid*.

As was true with respect to Dell, respondents had ample reason to believe—and took steps suggesting they understood—that the NVIDIA information came from insiders who were acting for personal reasons. Respondent Newman received an email containing NVIDIA's earnings-related numbers, sent by Kuo to Tortora and others, in which Kuo stated that the in-

9

formation came from "an accounting manager at
NVDA" and that Kuo had received it "through a
friend." Ex. 805; see Tr. 1870-1876. The tips con-
tained the type of detailed information that only an
insider would know, which was different in kind from
information provided to analysts from legitimate
sources in advance of an earnings announcement. See
*ibid.*; see also Tr. 493-496, 1209-1212, 1614-1616, 1631,
2611-2612; Exs. 803, 810. And Newman plainly be-
lieved the information was accurate—for instance,
when he received a gross margin report from Kuo in
advance of NVIDIA's May 2009 earnings announce-
ment, he shorted NVIDIA's stock within minutes. See
Exs. 818 (Kuo "[n]ailed everything  *  *  *  last
q[uarter]"), 2501-DB; Tr. 499-507.

Respondent Chiasson was told by Adondakis that
"a friend of [analyst] Jesse Tortora would be getting
information from Nvidia through a friend of his who
he went to church with and that the contact was—it
would have an Nvidia contact, essentially." Tr. 1878.
"Contact" was the way Chiasson and Adondakis re-
ferred to someone who worked at a particular compa-
ny. See Tr. 1878-1879. Chiasson traded on the inside
information with confidence, sometimes almost imme-
diately after receiving it. See Exs. 73, 900, 920, 2501-
LB. And when Chiasson had to document the basis
for his NVIDIA trades, he directed Adondakis to
create an internal report that left out any reference to
the insider. See Ex. 928; Tr. 1894-1895; cf. Tr. 1785.

2. Respondents' trial on securities-fraud charges
lasted for six weeks. At the close of the evidence,
respondents moved for a judgment of acquittal. They
also requested a jury instruction stating that an ele-
ment of the charged crimes was knowledge that the

10

insiders disclosed inside information for personal benefit. See App., *infra*, 6a.

The district court reserved decision on the motions and declined to give the requested instruction. See App., *infra*, 6a-7a. The court instructed the jury that the government had the burden to prove that the insiders "had a fiduciary or other relationship of trust and confidence with Dell and [NVIDIA], respectively"; the insiders "breached that duty of trust and confidence by disclosing material, nonpublic information" that was subsequently disclosed to the relevant respondent; the insiders "personally benefited in some way, directly or indirectly, from the disclosure of the allegedly inside information"; the respondent "knew that the information he obtained had been disclosed in breach of a duty" of trust and confidence; and the respondent used the information to purchase a security. Tr. 4028; see Tr. 4030-4033; see also Tr. 4037-4038 (charging that knowledge could be established by showing conscious avoidance).

As to personal benefit, the district court instructed the jury that "[t]he benefit does not need to be financial or tangible in nature." Tr. 4032-4033. Rather, the court charged, the benefit "could include obtaining some future advantage, developing or maintaining a business contact, enhancing the tipper's reputation, or the benefit one would obtain from simply making a gift of confidential information to a trading relative or friend." Tr. 4033; see also 12-cr-121 Docket entry No. 160, at 27-28 (S.D.N.Y. Oct. 18, 2012) (respondents' proposed charge).

The jury returned guilty verdicts on all counts, and the district court denied respondents' motions for acquittal. See App., *infra*, 8a. The court then sen-

11

tenced respondents to terms of imprisonment and imposed fines and forfeitures. See *ibid.*

3. On appeal, the Second Circuit reversed respondents' convictions and remanded "with instructions to dismiss the indictment as it pertains to [respondents] with prejudice." App., *infra*, 3a.

a. The court of appeals first addressed respondents' argument that the district court erred in instructing the jury on the "knowledge" element of an insider-trading violation. See App., *infra*, 14a-23a. The court agreed that the instruction was erroneous, ruling that "in order to sustain a conviction for insider trading, the Government must prove beyond a reasonable doubt that the tippee knew that an insider disclosed confidential information *and* that [the insider] did so in exchange for a personal benefit." *Id.* at 3a. The court also concluded that the instructional error was not harmless. See *id.* at 22a-23a.

b. The court of appeals next considered the sufficiency of the evidence that the Dell and NVIDIA insiders personally benefitted from disclosing confidential corporate information.

In describing the personal-benefit requirement, the court emphasized what it described as "the fundamental insight that, in order to form the basis for a fraudulent breach, the personal benefit received in exchange for confidential information must be of some consequence." App., *infra*, 26a. The court acknowledged that in *Dirks* v. *SEC*, 463 U.S. 646 (1983), this Court stated that "personal benefit" includes reputational benefit and "the benefit one would obtain from simply making a gift of confidential information to a trading relative or friend." App., *infra*, 25a (quoting *United States* v. *Jiau*, 734 F.3d 147, 153 (2d Cir. 2013)

12

(quoting *Dirks*, 463 U.S. at 664), cert. denied, 135 S. Ct. 311 (2014)).  But the court held that, "[t]o the extent *Dirks* suggests that a personal benefit may be inferred from a personal relationship between the tipper and tippee, where the tippee's trades 'resemble trading by the insider himself followed by a gift of the profits to the recipient,' * * * such an inference is impermissible in the absence of proof of a meaningfully close personal relationship that generates an exchange that is objective, consequential, and represents at least a potential gain of a pecuniary or similarly valuable nature." App., *infra*, 26a; see *ibid.* ("In other words, * * * this requires evidence of 'a relationship between the insider and the recipient that suggests a *quid pro quo* from the latter, or an intention to benefit the [latter].'") (quoting *Jiau*, 734 F.3d at 153) (quoting *Dirks*, 463 U.S. at 664)).  Under that standard, the court explained, the government may not "prove the receipt of a personal benefit by the mere fact of a friendship, particularly of a casual or social nature."  *Id.* at 25a; see *id.* at 26a-27a (describing benefit of friendship as "ephemeral").

Applying its novel gloss on *Dirks*, the court of appeals ruled that the evidence was insufficient to establish that the Dell insider (Ray) or the NVIDIA insider (Choi) obtained a personal benefit.  See App., *infra*, 27a-28a.  The court concluded that "the 'career advice' that Goyal gave Ray, the Dell tipper," did not suffice because it "was little more than the encouragement one would generally expect of a fellow alumnus or casual acquaintance" and because Goyal began supplying it before Ray "began providing any insider information" and would have continued to do so if Ray had not tipped him.  *Id.* at 27a; see *ibid.* (stating, despite

13

the fact that Ray did not testify, that "Ray himself
disavowed that any  * * *  *quid pro quo* existed").
But see Tr. 1514-1515, 1630 (Goyal testimony that he
gave greater assistance to Ray and that Ray at most
did not expressly say that he was providing infor-
mation only for that assistance).  The court also stated
that the friendship between Choi and Lim (his imme-
diate tippee) did not give rise to an inference of per-
sonal benefit because the two were only "casual ac-
quaintances" and because Choi did not receive any-
thing valuable from Lim or even know that Lim was
trading NVIDIA stock. App., *infra*, 28a.  But see Tr.
3044, 3083 (testimony from Lim that he traded NVID-
IA stock and told Choi so).

   c.  Finally, the court of appeals ruled that the gov-
ernment's evidence of respondents' knowledge was
insufficient to support a conviction.  Compare App.,
*infra*, 28a ("[T]he Government presented absolutely
no testimony or any other evidence that [respondents]
knew that they were trading on information obtained
from insiders, or [knew] that those insiders received
any benefit in exchange for such disclosures, or even
that [respondents] consciously avoided learning of
these facts."), with *id.* at 33a ("[T]he bare facts in
support of the Government's theory of the case are as
consistent with an inference of innocence as one of
guilt.").  The court found it "inconceivable" that a jury
could conclude that respondents "were aware of a
personal benefit" to the insiders "when Adondakis and
Tortora, who were more intimately involved  * * *  ,
disavowed any such knowledge." *Id.* at 30a.  And the
court rejected the argument that the "specificity,
timing, and frequency of the updates" provided to
respondents were "overwhelmingly suspicious." *Id.* at

14

30a-33a (citation omitted).  According to the court, any "inference of knowledge" was "undermined" by evidence that analysts estimate earnings and other metrics based on publicly available information; corporate insiders help analysts with models and projections; and Dell and NVIDIA leaked earnings data "arguably similar to the inside information" at issue in this case in advance of earnings announcements.  *Ibid.*

4. The government petitioned for rehearing en banc.  After calling for responses and accepting amicus submissions—including an amicus brief filed by the SEC arguing that the panel's ruling on personal benefit was "directly at odds with" *Dirks* and "could negatively affect the SEC's ability to bring insider trading actions," 13-1837 Docket entry No. 298, at 1-2 (2d Cir. Jan. 29, 2015)—the court of appeals denied the petition.  See App., *infra*, 35a-36a.

## REASONS FOR GRANTING THE PETITION

In an unprecedented ruling, the court of appeals broke with this Court's decision in *Dirks* v. *SEC*, 463 U.S. 646 (1983).  The court reinterpreted this Court's holding that an insider personally benefits when he "makes a gift of confidential information to a trading relative or friend," *id.* at 664, to require "proof of a meaningfully close personal relationship that generates an exchange that is objective, consequential, and represents at least a potential gain of a pecuniary or similarly valuable nature."  App., *infra*, 26a.  That holding cannot be reconciled with *Dirks*, which did not require an "exchange" to find liability for a gift of inside information and did not impose amorphous standards for the relationships that can support liability. The Second Circuit's novel test has also created a conflict with circuits that have faithfully applied

15

*Dirks*—both before and after the decision below. And the effect of the new rule will be to hurt market participants, disadvantage scrupulous market analysts, and impair the government's ability to protect the fairness and integrity of the securities markets. Those harmful consequences warrant this Court's review and reversal of the court of appeals' effort to rewrite this Court's decision in *Dirks*.

**A. The Second Circuit's Decision Conflicts With This Court's Decision In *Dirks* v. *SEC***

1. A corporate insider violates the antifraud provisions of Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. 78j(b), and Rule 10b-5 thereunder, 17 C.F.R. 240.10b-5, by "trad[ing] in the securities of his corporation on the basis of material, nonpublic information." *United States* v. *O'Hagan*, 521 U.S. 642, 651-652 (1997). Such trading "qualifies as a 'deceptive device,'" within the meaning of Section 10(b), because it violates the "relationship of trust and confidence" that exists "between the shareholders of a corporation and those insiders who have obtained confidential information by reason of their position with that corporation." *Id.* at 652 (citation and internal quotation marks omitted). To avoid "tak[ing] unfair advantage" of "uninformed  *  *  *  stockholders," a corporate insider in possession of such information must either publicly "disclose" it or "abstain from trading." *Ibid.* (citation and internal quotation marks omitted).[2]

---

[2]  In addition, a "corporate 'outsider'" violates the securities laws by misappropriating nonpublic information for trading "in breach of a duty owed not to a trading party, but to the source of the information"—for instance, a law firm that has been entrusted with corporate secrets. *O'Hagan*, 521 U.S. at 652-653.

16

In *Dirks*, this Court addressed the scope of "tipper-tippee" insider-trading liability—that is, liability that arises from an insider's disclosure of confidential corporate information to others who "exploit[]" it for their "personal gain." 463 U.S. at 659. The defendant in *Dirks*, who was a broker-dealer, received notice from an ex-officer at Equity Funding of America that the company's assets were "vastly overstated as a result of fraudulent corporate practices." *Id.* at 649. Having been urged to "verify the fraud and disclose it publicly," Dirks interviewed "corporation employees" who "corroborated" the bad acts; he then "openly discussed the information he had obtained with a number of clients and investors," some of whom decided to sell their holdings in the corporation's securities. *Id.* at 649-650. Although Dirks's efforts ultimately resulted in public exposure of the fraud, the SEC censured him for aiding and abetting violations of Rule 10b-5 "by repeating the [fraud] allegations" to the sellers. See *id.* at 649-651, 652 n.8.

On review, this Court disapproved the theory "that the antifraud provisions" always "require equal information among all traders." 463 U.S. at 657. That theory, the Court said, could "have an inhibiting influence on the role of market analysts, which  * * *  is necessary to the preservation of a healthy market." *Id.* at 658-659. But the Court confirmed that "[t]he need for a ban on some tippee trading is clear." *Id.* at 659.[3] The Court explained that a tippee's duty is "de-

---

[3]  The Court noted that it is unlawful for an insider to do "indirectly," through disclosing inside information to "'any other person,'" what the insider cannot do directly. 463 U.S. at 659 (quoting 15 U.S.C. 78t(b), which provides that "[i]t shall be unlawful for any person, directly or indirectly, to do any act or thing which it would

17

rivative from * * * the insider's duty"—that is, "a tippee assumes a fiduciary duty * * * when the insider has breached his fiduciary duty to the shareholders by disclosing the information to the tippee and the tippee knows or should know that there has been a breach." *Id.* at 660.

The test for a breach of duty by the insider, the Court held, is "whether the insider personally will benefit, directly or indirectly, from his disclosure." 463 U.S. at 662. The Court identified two different sets of cases in which a factfinder may infer from "objective facts and circumstances" the existence of such a benefit. *Id.* at 663-664. First, "there may be a relationship between the insider and the recipient that suggests a *quid pro quo* from the latter, or an intention to benefit the particular recipient." *Id.* at 664; see *id.* at 663 (noting that "pecuniary gain or a reputational benefit that will translate into future earnings" amounts to a personal benefit). In such cases, it may be inferred that the disclosing insider receives or hopes for some personal return—as, for instance, when the insider shows an "intention to benefit" a "particular" tippee, *id.* at 664, who is in a position to do the insider a substantial business favor. Second, "[t]he elements of fiduciary duty and exploitation of nonpublic information also exist when an insider makes a gift of confidential information to a trading relative or friend," as "[t]he tip and trade resemble trading by the insider himself followed by a gift of the profits to the recipient." *Ibid.*; see *Bateman Eichler,*

---

be unlawful for such person to do under the provisions of this chapter or any rule or regulation thereunder through or by means of any other person").

18

*Hill Richards, Inc.* v. *Berner*, 472 U.S. 299, 311 n.21 (1985).

Under that test, the Court concluded, "there was no actionable violation by Dirks" because the insiders did not breach their duty to shareholders. 463 U.S. at 665; see *id.* at 667. The "tippers were motivated by a desire to expose the fraud"; they "received no monetary or personal benefit for revealing Equity Funding's secrets, nor was their purpose to make a gift of valuable information to Dirks." *Id.* at 667.

2. The court of appeals' decision is irreconcilable with *Dirks*. In the guise of interpreting this Court's opinion, the court of appeals crafted a new, stricter personal-benefit test, stating that "[t]o the extent *Dirks* suggests that a personal benefit may be inferred from a personal relationship between the tipper and tippee, where the tippee's trades 'resemble trading by the insider himself followed by a gift of the profits to the recipient,' * * * we hold that such an inference is impermissible in the absence of proof of a meaningfully close personal relationship that generates an exchange that is objective, consequential, and represents at least a potential gain of a pecuniary or similarly valuable nature." App., *infra*, 26a.

That new "exchange" formulation erases a form of personal benefit that this Court has specifically identified. Under *Dirks*, an inference of a personal benefit to the insider arises in two situations: when the insider expects something in return for the disclosure of the confidential information, *or* when the insider freely gives a gift of information to a trading friend or relative without any expectation of receiving money or valuables as a result. 463 U.S. at 663-664; see, *e.g.*, 18 Donald C. Langevoort, *Insider Trading Regulation,*

19

*Enforcement, and Prevention* § 1:8, at 1-20 (2006); *id.*
§ 4:6, at 4-10 to 4-13.  The Court applied both of those
tests in finding that the insiders' exposure of a fraud
in *Dirks* was not done for personal benefit because it
involved neither "monetary or personal benefit" nor
"a gift of valuable information to Dirks."  463 U.S. at
667.

The Second Circuit purported to recognize that
second form of personal benefit, see App., *infra*, 25a,
but then rewrote the concept of a "gift" so as to elimi-
nate it.  The court held that an insider cannot be liable
on a gift theory unless he receives something from the
recipient of information "that is objective, consequen-
tial, and represents at least a potential gain of a pecu-
niary or similarly valuable nature," *id.* at 26a.  But
such an "exchange" is, by definition, not the same
thing as a "gift"; rather, it is a *quid pro quo*, "some-
thing for something."  See *Webster's New Interna-
tional Dictionary* 1056 (2d ed. 1958) (defining gift as
"anything voluntarily transferred * * * without com-
pensation"); see also *Dirks*, 463 U.S. at 663-664.  If the
personal-benefit test cannot be met by a gift-giver
unless an "exchange" takes place, then *Dirks*'s two
categories of personal benefit are collapsed into one—
and the entire "gift" discussion in *Dirks* becomes
superfluous.  See *United States* v. *Salman*, No. 14-
10204, 2015 WL 4068903, at *6 (9th Cir. July 6, 2015);
*SEC* v. *Payton*, No. 14 Civ. 4644, 2015 WL 1538454, at
*6 n.2 (S.D.N.Y. Apr. 6, 2015) ("[T]he *Dirks* decision
seems to distinguish a *quid pro quo* relationship from
instances where an insider makes a 'gift' of confiden-
tial information to a relative or friend; whereas, the
*Newman* decision suggests that the latter type of re-
lationship (i.e. mere friendship) can lead to an infer-

20

ence of personal benefit only where there is evidence that it is generally akin to *quid pro quo*.").

To the extent that anything remains of the gift category of personal benefit in light of the "exchange" requirement, the court of appeals also limited that category in another way that conflicts with *Dirks*: the court permitted an inference of benefit only when the insider's relationship to the friend or relative is "meaningfully close" (a phrase that the Second Circuit never defined). App., *infra*, 26a. But *Dirks* does not contain any such requirement—no doubt recognizing the reality that an insider need not be specially attached to his friends and relations in order to decide for his own personal reasons to confer on them a gift of inside information (which, of course, requires no monetary outlay).

The Second Circuit's stark departure from *Dirks* is manifested in its refusal to accept the jury's findings that the insiders in this case personally benefitted, either on a gift theory or on an exchange theory. A rational jury could find that the NVIDIA insider gifted valuable, inside quarterly earnings-related information to a friend whom he knew traded NVIDIA stock and that the Dell insider provided similar information to a market analyst either as a gift or in return for special advice and actions to promote his career. See pp. 3-5, 7-8, *supra*. Both insiders thus acted for personal benefit without any conceivable legitimate corporate purpose. While this Court recognized that the existence of personal benefit is "a question of fact" that will turn on "objective facts and circumstances," *Dirks*, 463 U.S. at 664, the Second Circuit demanded that the benefit in the gift context meet a heightened legal standard of being "consequential" and "repre-

21

sent[ing] at least a potential gain of a pecuniary or similarly valuable nature," and concluded that the friendships at issue were not "close" enough, nor the career advice important enough, to support the jury's verdict. App., *infra*, 24a-26a. But *Dirks* did not rule out certain kinds of personal benefits that might motivate an insider to breach his fiduciary duties or impose a litmus test for the type of friendships that could lead to gifts of inside information.

3. The Second Circuit's departure from *Dirks* seems to have reflected concern that inferring personal benefit from friendship between an insider and his tippee would transform every selective disclosure of inside information into a securities-law violation. See App., *infra*, 25a-26a. But that is a concern for which *Dirks* already accounts. *Dirks* recognizes that not all selective disclosures of confidential information trigger the disclose-or-abstain-from-trading rule. See 463 U.S. at 657-664. It explains that if an insider has a valid business purpose for selective disclosure (for instance, supplying data to another company in the course of merger talks), or mistakenly believes that information is not material or is already in the public domain, disclosure does not violate the insider's fiduciary duties. See *id.* at 662 & n.22; see also *id.* at 666-667 (finding that the tippers wanted to expose corporate fraud for shareholders' benefit). The fact that analysts (or others) may be friends with company insiders does not automatically preclude such a legitimate business reason for disclosure.

*Dirks* nevertheless makes clear that when the insider acts for his own gain or makes a gift of the confidential information for trading, he breaches his fiduciary duty by treating the corporation's confidential

22

information as his own. 463 U.S. at 662-664. That test was built on settled common-law fiduciary principles requiring insiders to disclose information when trading in their corporation's securities. *Id.* at 653 (citing *In re Cady, Roberts & Co.*, 40 SEC 907, 911 & n.13 (1961)). Although the Court acknowledged that inferring the insider's purpose "will not always be easy," it believed that the legal standard it announced provided the "guiding principle" necessary to inform market behavior and protect market integrity. *Id.* at 664. The Second Circuit nevertheless substituted its novel and imprecise legal rules for the "guiding principle" that this Court carefully fashioned for factfinders in *Dirks.* It had no authority to do so.

### B. The Second Circuit's Decision Conflicts With Decisions Of Other Courts Of Appeals

The Second Circuit's decision also conflicts with the decisions of other courts of appeals that have faithfully applied the personal-benefit standard set forth in *Dirks*. See *United States* v. *Salman*, 2015 WL 4068903 (9th Cir. July 6, 2015); *SEC* v. *Maio*, 51 F.3d 623 (7th Cir. 1995).

1. In *Salman*, the Ninth Circuit rejected the argument that evidence of insider trading is not sufficient unless the government proves that the insider received something consequential for disclosing confidential information. See 2015 WL 4068903, at *3-*7. The insider in *Salman* was Maher Kara, who worked at Citigroup; he disclosed to his brother Michael material, nonpublic information about "upcoming mergers and acquisitions of and by Citigroup clients," and Michael in turn disclosed the information to Salman, who traded on it. *Id.* at *1-*2; see *id.* at *2 (explaining that "Maher and Michael Kara enjoyed a close and

23

mutually beneficial relationship" and that Maher "gave Michael the inside information in order to 'benefit him'").

Defendant Salman relied on the Second Circuit's decision in this case to contend that his conviction could not be upheld in the absence of "evidence that Maher received * * * [a] tangible benefit" in exchange for his tips because "evidence of a friendship or familial relationship between tipper and tippee, standing alone, is insufficient." 2015 WL 4068903, at *6. The Ninth Circuit stated that "[t]o the extent [the Second Circuit's decision below] can be read to go so far, we decline to follow it. Doing so would require us to depart from the clear holding of *Dirks* that the element of breach of fiduciary duty is met where an 'insider makes a gift of confidential information to a trading relative or friend.'" *Ibid*. (citation omitted). In the Ninth Circuit's view, "Maher's disclosure of confidential information to Michael, knowing that he intended to trade on it, was precisely the 'gift * * *'" that *Dirks* envisioned." *Id*. at *4.[4]

The Ninth Circuit thus rejected the novel personal-benefit test fashioned by the court in this case. The Ninth Circuit did not, for example, condition Salman's liability—as the Second Circuit would have—on whether Maher and Michael engaged in an "exchange that is objective, consequential, and represents at

---

[4] Other courts of appeals have similarly noted that *Dirks* envisioned liability for making a "gift" of information. See *SEC* v. *Rocklage*, 470 F.3d 1, 7 n.4 (1st Cir. 2006) ("[T]he mere giving of a gift to a relative or friend is a sufficient personal benefit."); *SEC* v. *Yun*, 327 F.3d 1263, 1275, 1280 (11th Cir. 2003) (stating that under *Dirks* "a gift to a trading relative or friend" is sufficient "to create a 'benefit'" to the insider).

24

least a potential gain of a pecuniary or similarly valuable nature."  App., *infra*, 26a.  Nor did the Ninth Circuit ask whether the benefit that Maher received in exchange for the tips was "of some consequence." *Ibid.*  To the contrary, and in keeping with *Dirks*, the Ninth Circuit focused on whether the government adduced sufficient evidence that Maher gifted the confidential information to a trading relative.

2. The Seventh Circuit's decision in *Maio*, a civil case, is also inconsistent with the decision below.  Maio received material, nonpublic information about a tender offer from a corporate insider with whom he was good friends; Maio traded on the information himself, and also shared it with another trading friend.  See 51 F.3d at 626-627.  The Seventh Circuit concluded that the disclosure by the insider "was an improper gift of confidential corporate information" and rejected the argument that the insider's "disclosure was not improper because he did not receive any direct or indirect personal benefit as a result of his tip." *Id.* at 632-633.  The inference of personal benefit, the court explained, was "unassailable" in the absence of "some legitimate reason" for the disclosure:  "After all, [the insider] did not have to make any disclosure, so why tell Maio anything?" *Id.* at 633; see *United States* v. *Evans*, 486 F.3d 315, 321-323 (7th Cir.), cert. denied, 552 U.S. 1050 (2007).

Like the Ninth Circuit, the Seventh Circuit did not apply the additional requirements that the Second Circuit has now layered on top of *Dirks*'s personal-benefit test.  The Seventh Circuit did not suggest that liability turned on whether Maio's friendship with the insider was "meaningfully close" or whether the insider's disclosure was part of an "objective, consequen-

25

tial" exchange with a "potential gain of a pecuniary or similarly valuable nature." App., *infra*, 26a. And the inference that *Maio* drew—that a personal benefit for the insider can often be inferred from the absence of a "legitimate reason" for a disclosure, see 51 F.3d at 632-633—would be unavailable under the Second Circuit's analysis, which imposes additional artificial barriers to proving a personal benefit.

3. The Ninth and Seventh Circuits thus adhere to a personal-benefit standard, as defined in *Dirks*, from which the Second Circuit has now departed. That difference between the circuits raises the specter of uneven enforcement of the securities laws against individuals who are all participating in the same nationwide capital markets. See generally *O'Hagan*, 521 U.S. at 658.

C.   **The Second Circuit's Erroneous Redefinition Of Personal Benefit Will Harm The Fair And Efficient Operation Of The Securities Markets And Warrants Review**

In *Dirks*, this Court granted the petition for a writ of certiorari "[i]n view of the importance" of the question presented by that case. 463 U.S. at 652. The question presented here is similarly important.[5] The

---

[5] The Second Circuit's personal-benefit analysis already has been the subject of extensive commentary—much of it critical. See, *e.g.*, Ben Protess & Matthew Goldstein, *Appeals Court Deals Setback to Crackdown on Insider Trading*, N.Y. Times, at A1 (Dec. 11, 2014) ("[T]he court rewrote the insider trading playbook, imposing the greatest limits on prosecutors in a generation."); Stephanie Russell-Kraft, *2nd Circ. Invites Insiders to Save the Tips for Friends*, Law360 (Dec. 18, 2014), http://www.law360. com/articles/605913; Michael Perino, *The Gift of Inside Information* (Dec. 12, 2014), http://dealbook.nytimes.com/2014/12/12/

26

Second Circuit's alteration of the *Dirks* standard frustrates key purposes of the securities laws. It licenses trading by insiders' favored tippees, thereby shifting losses to investors who lack access to confidential corporate information and eroding public confidence in the integrity of securities markets. It disadvantages legitimate analysts who pursue research and modeling based on authorized information. And it blurs the line between legitimate and prohibited activity. The Court should correct the Second Circuit's erroneous redefinition of personal benefit. Delay in doing so will result in continuing and serious harm.

1. "[E]liminat[ing] 'use of inside information for personal advantage,'" *Dirks*, 463 U.S. at 662 (citation omitted), advances a "basic purpose" of the securities laws: "to insure honest securities markets and thereby promote investor confidence." *Chadbourne & Parke LLP* v. *Troice*, 134 S. Ct. 1058, 1067 (2014) (quoting *O'Hagan*, 521 U.S. at 658); see also *O'Hagan*, 521 U.S. at 657. An insider who makes personal use of inside information, without a corporate justification, "tak[es] unfair advantage of uninformed stockholders." *O'Hagan*, 521 U.S. at 652 (brackets and ellipses omitted) (quoting *Chiarella* v. *United States*, 445 U.S. 222, 228-229 (1980)). Such activity also strips investors of confidence that the markets are fair and open. See *id.* at 658-659. While some "informational disparity is inevitable in the securities markets," a rational investor will "hesitate to venture * * * capital" in a

---

the-gift-of-inside-information/; see also Dan Stroh, *Murking* Dirks: *Personal Benefits in Insider Trading Violations*, Univ. of Cincinnati L. Rev. Blog (Mar. 10, 2015), http://uclawreview.org/2015/03/10.

27

rigged game—one in which he faces a systematic "informational disadvantage" vis-à-vis insiders and their chosen beneficiaries that can never "be overcome with research or skill." *Ibid.*; see *Dirks*, 463 U.S. at 661-662; see generally *Stoneridge Inv. Partners, LLC* v. *Scientific-Atlanta, Inc.*, 552 U.S. 148, 161 (2008). By raising and altering the standard for personal benefit, the Second Circuit's decision insulates from liability deceptive acts that undermine the integrity of the markets.

2. The Second Circuit's decision also negatively affects the activities of legitimate market analysts. As *Dirks* explained, analysts undertaking lawful functions play an important "role" in "the preservation of a healthy market": they "ferret out and analyze information" that allows them to make "judgments as to the market worth of a corporation's securities," thereby enhancing "efficiency in pricing." 463 U.S. at 658-659 & n.17 (citation omitted). *Dirks* thus framed its personal-benefit standard to avoid an "inhibiting influence" on analysts' honest efforts. *Id.* at 658.

But precisely because analysts often obtain information "by meeting with and questioning corporate officers and others who are insiders," they are well positioned to acquire and trade on material, nonpublic corporate information that has been disclosed in breach of a fiduciary duty rather than in furtherance of a corporate interest. *Dirks*, 463 U.S. at 658-659. When analysts do gain illicit information by "contrivance," *O'Hagan*, 521 U.S. at 658-659, they no longer serve to keep the markets "healthy." *Dirks*, 463 U.S. at 658; see generally *United States* v. *Naftalin*, 441 U.S. 768, 776 (1979). Instead, they harm the efficiency of the markets—not only by hurting investors in the

28

same way that all insider trading does, but also by undermining the work of the analysts who are playing by the rules. Effective professional analysis of the value of a company's stock is a labor-intensive process that demands extensive research, an understanding of financial and other technical data, in-depth knowledge of the relevant industry, and sophisticated modeling. See, *e.g.*, *DeMarco* v. *Lehman Bros., Inc.*, 222 F.R.D. 243, 246 (S.D.N.Y. 2004); App., *infra*, 31a; see also CFA Institute, *Code of Ethics and Professional Conduct* (June 2014), http://www.cfapubs.org/doi/pdf/ 10.2469/ccb.v2014.n6.1. If certain analysts sidestep that labor by siphoning secret information from insiders in breach of their duties, thereby arriving at "predictions" of corporate performance that no model can equal, then other analysts will be discouraged from doing the work that is necessary for the markets to function effectively.

*Dirks* considered carefully the need for analysts to "be sure when the line" between legal and illegal activity "is crossed," and the Court's description of the proof required to establish the existence of an insider's personal benefit therefore already incorporates the relevant analyst-specific considerations. 463 U.S. at 658-659 & nn.17-18. The Second Circuit nevertheless seemed to believe that the involvement of analysts in the conduct proved here allowed it to deem the personal-benefit standard set forth in *Dirks* too lax, lest that standard encompass mere casual friendships. Cf. App., *infra*, 31a-33a. That unjustified reasoning has upset the balance struck in *Dirks*, and the court's new, restrictive definition of personal benefit will reward dishonest analysts at the expense of honest

29

ones (and therefore is likely to swell the ranks of the former group).

3. The court of appeals applied its personal-benefit standard in ruling that the trial evidence was insufficient to convict respondents of insider trading. See App., *infra*, 23a-34a. Those case-specific sufficiency-of-the-evidence rulings are no obstacle to review. If this Court grants review and corrects the lower court's misinterpretation of *Dirks*, it should remand for further consideration of the rulings in light of the correct legal standards and the record in this case.

a. In finding the evidence insufficient to establish that the Dell and NVIDIA insiders disclosed the confidential information at issue for a personal benefit, the court of appeals applied its incorrect redefinition of the personal-benefit standard. The court of appeals focused on whether the relationship between the insiders and their tippees was "meaningfully close," and whether the insiders received anything "objective, consequential, and represent[ing] at least a potential gain of a pecuniary or similarly valuable nature." App., *infra*, 25a-28a. But under *Dirks*, those factors are not determinative. And applying *Dirks*, the evidence was sufficient to support a rational jury's finding, taking the evidence in the light most favorable to the verdict, of personal benefit to the insiders. See pp. 2-9, 20, *supra*. A remand for further consideration of that issue would therefore be warranted.

b. The Second Circuit also stated that "the Government presented absolutely no testimony or any other evidence" that respondents knew, or consciously avoided knowing, that they were trading on information in exchange for which the insiders "received any benefit." App., *infra*, 28a. But see *id.* at 33a

30

(stating that evidence was in equipoise).  But whether respondents knew that the insiders obtained a personal benefit is likewise bound up with the legal question of what constitutes a personal benefit in the first place.  It is one thing to say that a tippee-defendant is not liable unless he knew (or consciously avoided knowing) that an insider had a "meaningfully close personal relationship" with the first-line tippee and engaged in an "exchange" that is "consequential." App., *infra*, 26a.  But if the knowledge requirement is met when a tippee knows (or consciously avoids knowing) that an insider may receive a personal benefit by simply making a gift to a trading friend or relative, then a different quantum of evidence will suffice to show knowledge.  And a jury may even more readily infer conscious avoidance by sophisticated hedge fund managers who can appreciate that accurate inside information about corporate earnings cannot be legitimately obtained, quarter after quarter, without improper disclosure—and whose conduct reveals such awareness.  See pp. 5-9, 28, *supra*.

c. The court of appeals separately stated that the evidence failed to establish that respondents knew even that the information on which they were trading was "obtained from insiders." App., *infra*, 28a.  But not even respondents support that suggestion.  See 13-1917 Docket entry No. 116, at 7 (2d Cir. Aug. 15, 2013) (Chiasson brief stating that "the trial evidence showed that Chiasson was a remote tippee who knew that [his source] had received detailed information, leaked by insiders at Dell and NVIDIA"); 13-1917 Docket entry No. 97, at 41 (2d Cir. Aug. 15, 2013) (Newman brief arguing that "indications that the information came from insiders" was not sufficient to

31

show knowledge of personal benefit). And the trial evidence establishes the contrary proposition. See pp. 5-6, 8-9, *supra*.[6] Indeed, the court of appeals itself recognized that Chiasson was informed that "Goyal 'was talking to someone within Dell'" (App., *infra*, 29a)—refuting the suggestion that he did not know that insiders were the source of the information on which he traded.

d. Under the correct personal-benefit standard (and viewing the record in the light most favorable to the verdict), a rational jury could find that respondents at least consciously avoided confirming that the detailed pre-announcement earnings-related information they used to reap significant profits was disclosed by insiders for personal advantage rather than for some corporate purpose. See pp. 5-9, *supra*. This Court should grant review to correct the Second Circuit's mistaken interpretation of *Dirks*, then remand for the court of appeals to apply that standard to the record in this case.

---

[6] The transcript pages cited by the court of appeals do not support its statement. See App., *infra*, 29a (citing Tr. 1708, 1878). On the first cited page, Adondakis (who worked for Chiasson) testified that he "told Mr. Chiasson" that "Sandy [Goyal, a first-line tippee] was talking to someone within Dell to get information" and that Goyal was "willing to share information on Dell with me." Tr. 1708. On the second cited page, Adondakis testified that he explained to Chiasson that "a friend of Jesse Tortora would be getting information from Nvidia through a friend of his who he went to church with and that the contact was—it would have an Nvidia contact, essentially." Tr. 1878. And on the next page of the transcript, Adondakis explained that when he discussed a "contact" at a company with Chiasson it meant that the contact worked at the company. Tr. 1879.

32

4. This Court's intervention is warranted now. If allowed to stand, the court of appeals' novel personal-benefit standard will restrict enforcement of Section 10(b)'s ban on insider trading, create uncertainty in the financial community about the boundaries of legitimate conduct, and produce disparate results in different circuits in the application of the federal securities laws.

First, the decision below unjustifiably impedes the government's ability to restrain and punish tippers and tippees engaging in culpable behavior.[7] A case in which an insider gifts inside information to a trading friend or relative will not meet the Second Circuit's new standard absent evidence that the relationship was "meaningfully close" and that the insider stood to obtain money (or something of "similar" value) via an "exchange." App., *infra*, 26a. Such evidence will not always exist. Accordingly, until the Second Circuit's erroneous view is corrected, conduct long understood as prohibited under *Dirks* will elude criminal prosecution—creating an obvious roadmap for unscrupulous insiders and tippees.[8] And given that the majority of criminal securities cases are brought in the Second

---

[7] The Second Circuit's redefinition of what constitutes a personal benefit applies in civil enforcement actions as well as criminal prosecutions. See, *e.g.*, *Maio*, 51 F.3d at 630-631.

[8] Indeed, the court of appeals' new standard has already resulted in vacatur of the guilty pleas of a number of insider-trading defendants "in light of *Newman*'s clarification of the personal benefit and tippee knowledge requirements." *United States* v. *Conradt*, No. 12 cr 887, 2015 WL 480419, at *1 (S.D.N.Y. Jan. 22, 2015).

33

Circuit,[9] much culpable conduct will likely go unde-terred and unpunished.

Second, because the widely publicized ruling in this case raises the bar to prosecuting insider trading, it increases the chances that such conduct will proliferate. Empirical evidence shows that "a significant portion of the market movement associated with corporate events" already "occurs before the event is announced." James D. Cox, *Giving Tippers a Pass: U.S. v. Newman* (Jan. 27, 2015), http://clsbluesky.law.columbia.edu/2015/01/27/giving-tippers-a-pass-u-s-v-newman-3/ (citing Melvin Avon Eisenberg & James D. Cox, *Business Organizations* 944 (11th ed. 2014)). The Second Circuit's decision is likely to exacerbate that phenomenon by emboldening analysts and other sophisticated market participants to engage in behavior hitherto restricted by *Dirks*. See *ibid.* ("[R]emote tippees are likely  *  *  *  pervasive and truly are insidious. *Newman* pours gas onto this raging fire."). And market participants and analysts who seek to comply with the law will lack clear guidance about the legal limits on their conduct. That is particularly intolerable in the circuit that is home to the financial capital of the Nation, if not the world.

Finally, while the existing circuit split alone justifies this Court's review to restore a uniform interpretation of *Dirks*, the Second Circuit's innovation threatens to destabilize the law elsewhere. The Second Circuit has long had an outsize influence on the development and enforcement of the securities laws—even when it is wrong. See, *e.g.*, *Morrison* v. *National*

---

[9] See generally *Federal Judicial Caseload Statistics*, http://www.uscourts.gov/statistics-reports/analysis-reports/federal-judicial-caseload-statistics.

34

*Australia Bank Ltd.*, 561 U.S. 247, 260 (2010) (noting that, despite its doubts about the Second Circuit's extraterritoriality rule, the D.C. Circuit "deferred" to that court "because of its 'preeminence in the field of securities law'") (citation omitted).   That influence heightens the need for this Court's intervention: when the Second Circuit takes the law of insider trading off course, other courts may follow.   Given the court of appeals' stark departure from *Dirks*, reaffirmation of this Court's time-tested rule is warranted now.

### CONCLUSION

The petition for a writ of certiorari should be granted.

Respectfully submitted.

DONALD B. VERRILLI, JR.
  *Solicitor General*
LESLIE R. CALDWELL
  *Assistant Attorney General*
MICHAEL R. DREEBEN
  *Deputy Solicitor General*
ELAINE J. GOLDENBERG
  *Assistant to the Solicitor General*
ROSS B. GOLDMAN
  *Attorney*

JULY 2015

# APPENDIX A

## UNITED STATES COURT OF APPEALS
## FOR THE SECOND CIRCUIT

———

August Term, 2013

Nos. 13-1837-cr (L), 13-1917-cr (con)

UNITED STATES OF AMERICA, APPELLEE

*v.*

TODD NEWMAN, ANTHONY CHIASSON,
DEFENDANTS-APPELLANTS

JON HORVATH, DANNY KUO, HYUNG G. LIM, MICHAEL
STEINBERG, DEFENDANTS[1]

———

Argued:   Apr. 22, 2014
Decided:   Dec. 10, 2014

———

Appeal from United States District Court for the
Southern District of New York.
No. 12 CR 121 (RJS)—Richard J. Sullivan, Judge

———

Before:   WINTER, PARKER, and HALL, *Circuit Judges*.

BARRINGTON D. PARKER, *Circuit Judge*:

———

[1]  The Clerk of Court is directed to amend the caption as set forth above.

(1a)

2a

Defendants-appellants Todd Newman and Anthony Chiasson appeal from judgments of conviction entered on May 9, 2013, and May 14, 2013, respectively in the United States District Court for the Southern District of New York (Richard J. Sullivan, *J.*) following a six-week jury trial on charges of securities fraud in violation of sections 10(b) and 32 of the Securities Exchange Act of 1934 (the "1934 Act"), 48 Stat. 891, 904 (codified as amended at 15 U.S.C. §§ 78j(b), 78ff), Securities and Exchange Commission (SEC) Rules 10b-5 and 10b5-2 (codified at 17 C.F.R. §§ 240.10b-5, 240.10b5-2), and 18 U.S.C. § 2, and conspiracy to commit securities fraud in violation of 18 U.S.C. § 371.

The Government alleged that a cohort of analysts at various hedge funds and investment firms obtained material, nonpublic information from employees of publicly traded technology companies, shared it amongst each other, and subsequently passed this information to the portfolio managers at their respective companies. The Government charged Newman, a portfolio manager at Diamondback Capital Management, LLC ("Diamondback"), and Chiasson, a portfolio manager at Level Global Investors, L.P. ("Level Global"), with willfully participating in this insider trading scheme by trading in securities based on the inside information illicitly obtained by this group of analysts. On appeal, Newman and Chiasson challenge the sufficiency of the evidence as to several elements of the offense, and further argue that the district court erred in failing to instruct the jury that it must find that a tip-

3a

pee knew that the insider disclosed confidential information in exchange for a personal benefit.

We agree that the jury instruction was erroneous because we conclude that, in order to sustain a conviction for insider trading, the Government must prove beyond a reasonable doubt that the tippee knew that an insider disclosed confidential information *and* that he did so in exchange for a personal benefit. Moreover, we hold that the evidence was insufficient to sustain a guilty verdict against Newman and Chiasson for two reasons. *First*, the Government's evidence of any personal benefit received by the alleged insiders was insufficient to establish the tipper liability from which defendants' purported tippee liability would derive. *Second*, even assuming that the scant evidence offered on the issue of personal benefit was sufficient, which we conclude it was not, the Government presented no evidence that Newman and Chiasson knew that they were trading on information obtained from insiders in violation of those insiders' fiduciary duties.

Accordingly, we reverse the convictions of Newman and Chiasson on all counts and remand with instructions to dismiss the indictment as it pertains to them with prejudice.

## BACKGROUND

This case arises from the Government's ongoing investigation into suspected insider trading activity at hedge funds. On January 18, 2012, the Government unsealed charges against Newman, Chiasson, and sev-

4a

eral other investment professionals.   On February 7, 2012, a grand jury returned an indictment.   On August 28, 2012, a twelve-count Superseding Indictment S2 12 Cr. 121 (RJS) (the "Indictment") was filed. Count One of the Indictment charged Newman, Chiasson, and a co-defendant with conspiracy to commit securities fraud, in violation of 18 U.S.C. § 371.   Each of Counts Two through Five charged Newman and each of Counts Six through Ten charged Chiasson with securities fraud, in violation of sections 10(b) and 32 of the 1934 Act, SEC Rules 10b-5 and 105b-2, and 18 U.S.C. § 2.   A co-defendant was charged with securities fraud in Counts Eleven and Twelve.

At trial, the Government presented evidence that a group of financial analysts exchanged information they obtained from company insiders, both directly and more often indirectly.   Specifically, the Government alleged that these analysts received information from insiders at Dell and NVIDIA disclosing those companies' earnings numbers before they were publicly released in Dell's May 2008 and August 2008 earnings announcements and NVIDIA's May 2008 earnings announcement.   These analysts then passed the inside information to their portfolio managers, including Newman and Chiasson, who, in turn, executed trades in Dell and NVIDIA stock, earning approximately $4 million and $68 million, respectively, in profits for their respective funds.

Newman and Chiasson were several steps removed from the corporate insiders and there was no evidence

5a

that either was aware of the source of the inside in-
formation.   With respect to the Dell tipping chain, the
evidence established that Rob Ray of Dell's investor
relations department tipped information regarding
Dell's consolidated earnings numbers to Sandy Goyal,
an analyst at Neuberger Berman.   Goyal in turn gave
the information to Diamondback analyst Jesse Tor-
tora.   Tortora in turn relayed the information to his
manager Newman as well as to other analysts includ-
ing Level Global analyst Spyridon "Sam" Adondakis.
Adondakis then passed along the Dell information to
Chiasson, making Newman and Chiasson three and
four levels removed from the inside tipper, respec-
tively.

With respect to the NVIDIA tipping chain, the
evidence established that Chris Choi of NVIDIA's
finance unit tipped inside information to Hyung Lim, a
former executive at technology companies Broadcom
Corp. and Altera Corp., whom Choi knew from church.
Lim passed the information to co-defendant Danny
Kuo, an analyst at Whittier Trust.   Kuo circulated the
information to the group of analyst friends, including
Tortora and Adondakis, who in turn gave the infor-
mation to Newman and Chiasson, making Newman and
Chiasson four levels removed from the inside tippers.

Although Ray and Choi have yet to be charged ad-
ministratively, civilly, or criminally for insider trading
or any other wrongdoing, the Government charged
that Newman and Chiasson were criminally liable for
insider trading because, as sophisticated traders, they

6a

must have known that information was disclosed by insiders in breach of a fiduciary duty, and not for any legitimate corporate purpose.

At the close of evidence, Newman and Chiasson moved for a judgment of acquittal pursuant to Federal Rule of Criminal Procedure 29. They argued that there was no evidence that the corporate insiders provided inside information in exchange for a personal benefit which is required to establish tipper liability under *Dirks v. S.E.C.*, 463 U.S. 646 (1983). Because a tippee's liability derives from the liability of the tipper, Newman and Chiasson argued that they could not be found guilty of insider trading. Newman and Chiasson also argued that, even if the corporate insiders had received a personal benefit in exchange for the inside information, there was no evidence that they knew about any such benefit. Absent such knowledge, appellants argued, they were not aware of, or participants in, the tippers' fraudulent breaches of fiduciary duties to Dell or NVIDIA, and could not be convicted of insider trading under *Dirks*. In the alternative, appellants requested that the court instruct the jury that it must find that Newman and Chiasson knew that the corporate insiders had disclosed confidential information for personal benefit in order to find them guilty.

The district court reserved decision on the Rule 29 motions. With respect to the appellants' requested jury charge, while the district court acknowledged that their position was "supportable certainly by the lan-

7a

guage of *Dirks*," Tr. 3595:10-12, it ultimately found that it was constrained by this Court's decision in *S.E.C. v. Obus*, 693 F.3d 276 (2d Cir. 2012), which listed the elements of tippee liability without enumerating knowledge of a personal benefit received by the insider as a separate element.   Tr. 3604:3-3605:5. Accordingly, the district court did not give Newman and Chiasson's proposed jury instruction.   Instead, the district court gave the following instructions on the tippers' intent and the personal benefit requirement:

> Now, if you find that Mr. Ray and/or Mr. Choi had a fiduciary or other relationship of trust and confidence with their employers, then you must next consider whether the [G]overnment has proven beyond a reasonable doubt that they intentionally breached that duty of trust and confidence by disclosing material[,] nonpublic information for their own benefit.

Tr. 4030.

On the issue of the appellants' knowledge, the district court instructed the jury:

> To meet its burden, the [G]overnment must also prove beyond a reasonable doubt that the defendant you are considering knew that the material, nonpublic information had been disclosed by the insider in breach of a duty of trust and confidence.   The mere receipt of material, nonpublic information by a defendant, and even trading on that information, is not sufficient; he must have known that it was orig-

8a

inally disclosed by the insider in violation of a duty
of confidentiality.

Tr. 4033:14-22.

On December 17, 2012, the jury returned a verdict
of guilty on all counts.   The district court subse-
quently denied the appellants' Rule 29 motions.

On May 2, 2013, the district court sentenced New-
man to an aggregate term of 54 months' imprisonment,
to be followed by one year of supervised release, im-
posed a $500 mandatory special assessment, and or-
dered Newman to pay a $1 million fine and to forfeit
$737,724.   On May 13, 2013, the district court sen-
tenced Chiasson to an aggregate term of 78 months'
imprisonment, to be followed by one year of supervised
release, imposed a $600 mandatory special assessment,
and ordered him to pay a $5 million fine and forfeiture
in an amount not to exceed $2 million.[2]   This appeal
followed.

## DISCUSSION

Newman and Chiasson raise a number of arguments
on appeal.   Because we conclude that the jury in-
structions were erroneous and that there was insuffi-
cient evidence to support the convictions, we address
only the arguments relevant to these issues.   We re-
view jury instructions *de novo* with regard to whether
the jury was misled or inadequately informed about

---

[2] The district court subsequently set the forfeiture amount at
$1,382,217.

9a

the applicable law. *See United States v. Moran-Toala*, 726 F.3d 334, 344 (2d Cir. 2013).

## I.   The Law of Insider Trading

Section 10(b) of the 1934 Act, 15 U.S.C. § 78j(b), prohibits the use "in connection with the purchase or sale of any security . . . [of] any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe . . . ."   Although Section 10(b) was designed as a catch-all clause to prevent fraudulent practices, *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 202-06 (1976), neither the statute nor the regulations issued pursuant to it, including Rule 10b-5, expressly prohibit insider trading.   Rather, the unlawfulness of insider trading is predicated on the notion that insider trading is a type of securities fraud proscribed by Section 10(b) and Rule 10b-5.   *See Chiarella v. United States*, 445 U.S. 222, 226-30 (1980).

### A.   The "Classical" and "Misappropriation" Theories of Insider Trading

The classical theory holds that a corporate insider (such as an officer or director) violates Section 10(b) and Rule 10b-5 by trading in the corporation's securities on the basis of material, nonpublic information about the corporation.   *Id.* at 230.   Under this theory, there is a special "relationship of trust and confidence between the shareholders of a corporation and those insiders who have obtained confidential information by reason of their position within that corpora-

10a

tion." *Id.* at 228.   As a result of this relationship, corporate insiders that possess material, nonpublic information have "a duty to disclose [or to abstain from trading] because of the 'necessity of preventing a corporate insider from . . . tak[ing] unfair advantage of . . . uninformed . . . stockholders.'"   *Id.* at 228-29 (citation omitted).

In accepting this theory of insider trading, the Supreme Court explicitly rejected the notion of "a general duty between all participants in market transactions to forgo actions based on material, nonpublic information." *Id.* at 233.   Instead, the Court limited the scope of insider trading liability to situations where the insider had "a duty to disclose arising from a relationship of trust and confidence between parties to a transaction," such as that between corporate officers and shareholders.   *Id.* at 230.

An alternative, but overlapping, theory of insider trading liability, commonly called the "misappropriation" theory, expands the scope of insider trading liability to certain other "outsiders," who do not have any fiduciary or other relationship to a corporation or its shareholders.   Liability may attach where an "outsider" possesses material non-public information about a corporation and another person uses that information to trade in breach of a duty owed to the owner. *United States v. O'Hagan*, 521 U.S. 642, 652-53 (1997); *United States v. Libera*, 989 F.2d 596, 599-600 (2d Cir. 1993).   In other words, such conduct violates Section 10(b) because the misappropriator engages in decep-

11a

tion by pretending "loyalty to the principal while secretly converting the principal's information for personal gain."   *Obus*, 693 F.3d at 285 (citations omitted).

B.  Tipping Liability

The insider trading case law, however, is not confined to insiders or misappropriators who trade for their own accounts.   *Id.* at 285.   Courts have expanded insider trading liability to reach situations where the insider or misappropriator in possession of material nonpublic information (the "tipper") does not himself trade but discloses the information to an outsider (a "tippee") who then trades on the basis of the information before it is publicly disclosed.   *See Dirks*, 463 U.S. at 659.   The elements of tipping liability are the same, regardless of whether the tipper's duty arises under the "classical" or the "misappropriation" theory. *Obus*, 693 F.3d at 285-86.

In *Dirks*, the Supreme Court addressed the liability of a tippee analyst who received material, nonpublic information about possible fraud at an insurance company from one of the insurance company's former officers.   *Dirks*, 463 U.S. at 648-49.   The analyst relayed the information to some of his clients who were investors in the insurance company, and some of them, in turn, sold their shares based on the analyst's tip.   *Id.* The SEC charged the analyst Dirks with aiding and abetting securities fraud by relaying confidential and material inside information to people who traded the stock.

12a

In reviewing the appeal, the Court articulated the general principle of tipping liability: "Not only are insiders forbidden by their fiduciary relationship from personally using undisclosed corporate information to their advantage, but they may not give such information to an outsider for the same improper purpose of exploiting the information for their personal gain." *Id.* at 659 (citation omitted). The test for determining whether the corporate insider has breached his fiduciary duty "is whether the insider personally will benefit, directly or indirectly, from his disclosure. Absent some personal gain, *there has been no breach of duty* . . . ." *Id.* at 662 (emphasis added).

The Supreme Court rejected the SEC's theory that a recipient of confidential information (i.e. the "tippee") must refrain from trading "whenever he receives inside information from an insider." *Id.* at 655. Instead, the Court held that "[t]he tippee's duty to disclose or abstain is derivative from that of the insider's duty." *Id.* at 659. Because the *tipper's* breach of fiduciary duty requires that he "personally will benefit, directly or indirectly, from his disclosure," *id.* at 662, a tippee may not be held liable in the absence of such benefit. Moreover, the Supreme Court held that a tippee may be found liable "only when the insider has breached his fiduciary duty . . . *and* the tippee knows or should know that there has been a breach." *Id.* at 660 (emphasis added). In *Dirks*, the corporate insider provided the confidential information in order to expose a fraud in the company and not for any person-

13a

al benefit, and thus, the Court found that the insider had not breached his duty to the company's shareholders and that Dirks could not be held liable as tippee.

### E. *Mens Rea*

Liability for securities fraud also requires proof that the defendant acted with scienter, which is defined as "a mental state embracing intent to deceive, manipulate or defraud." *Hochfelder*, 425 U.S. at 193 n.12. In order to establish a criminal violation of the securities laws, the Government must show that the defendant acted "willfully." 15 U.S.C. § 78ff(a). We have defined willfulness in this context "as a realization on the defendant's part that he was doing a wrongful act under the securities laws." *United States v. Cassese*, 428 F.3d 92, 98 (2d Cir. 2005) (internal quotation marks and citations omitted); *see also United States v. Dixon*, 536 F.2d 1388, 1395 (2d Cir. 1976) (holding that to establish willfulness, the Government must "establish a realization on the defendant's part that he was doing a wrongful act . . . under the securities laws" and that such an act "involve[d] a significant risk of effecting the violation that occurred.") (quotation omitted).

## II.   The Requirements of Tippee Liability

The Government concedes that tippee liability requires proof of a personal benefit to the insider. Gov't Br. 56. However, the Government argues that it was not required to prove that Newman and Chias-

14a

son knew that the insiders at Dell and NVIDIA received a personal benefit in order to be found guilty of insider trading. Instead, the Government contends, consistent with the district court's instruction, that it merely needed to prove that the "defendants traded on material, nonpublic information they knew insiders had disclosed in breach of a duty of confidentiality . . . ." Gov't Br. 58.

In support of this position, the Government cites *Dirks* for the proposition that the Supreme Court only required that the "tippee know that the tipper disclosed information in *breach of a duty*." *Id.* at 40 (citing *Dirks*, 463 U.S. at 660) (emphasis added). In addition, the Government relies on dicta in a number of our decisions post-*Dirks*, in which we have described the elements of tippee liability without specifically stating that the Government must prove that the tippee knew that the corporate insider who disclosed confidential information did so for his own personal benefit. *Id.* at 41-44 (citing, *inter alia*, *United States v. Jiau*, 734 F.3d 147, 152-53 (2d Cir. 2013); *Obus*, 693 F.3d at 289; *S.E.C. v. Warde*, 151 F.3d 42, 48-49 (2d Cir. 1998)). By selectively parsing this dictum, the Government seeks to revive the absolute bar on tippee trading that the Supreme Court explicitly rejected in *Dirks*.

Although this Court has been accused of being "somewhat Delphic" in our discussion of what is required to demonstrate tippee liability, *United States v. Whitman*, 904 F. Supp. 2d 363, 371 n.6 (S.D.N.Y.

15a

2012), the Supreme Court was quite clear in *Dirks*. *First*, the tippee's liability derives *only* from the tipper's breach of a fiduciary duty, *not* from trading on material, non-public information. *See Chiarella*, 445 U.S. at 233 (noting that there is no "general duty between all participants in market transactions to forgo actions based on material, nonpublic information"). *Second*, the corporate insider has committed no breach of fiduciary duty unless he receives a personal benefit in exchange for the disclosure. *Third*, even in the presence of a tipper's breach, a tippee is liable only if he knows or should have known of the breach.

While we have not yet been presented with the question of whether the tippee's knowledge of a tipper's breach requires knowledge of the tipper's personal benefit, the answer follows naturally from *Dirks*. *Dirks* counsels us that the exchange of confidential information for personal benefit is not separate from an insider's fiduciary breach; it *is* the fiduciary breach that triggers liability for securities fraud under Rule 10b-5. For purposes of insider trading liability, the insider's disclosure of confidential information, standing alone, is not a breach. Thus, without establishing that the tippee knows of the personal benefit received by the insider in exchange for the disclosure, the Government cannot meet its burden of showing that the tippee knew of a breach.

The Government's overreliance on our prior dicta merely highlights the doctrinal novelty of its recent insider trading prosecutions, which are increasingly

16a

targeted at remote tippees many levels removed from corporate insiders.   By contrast, our prior cases generally involved tippees who directly participated in the tipper's breach (and therefore had knowledge of the tipper's disclosure for personal benefit) or tippees who were explicitly apprised of the tipper's gain by an intermediary tippee.   *See, e.g.*, *Jiau*, 734 F.3d at 150 ("To provide an incentive, Jiau promised the tippers insider information for their own private trading."); *United States v. Falcone*, 257 F.3d 226, 235 (2d Cir. 2001) (affirming conviction of remote tipper where intermediary tippee paid the inside tipper and had told remote tippee "the details of the scheme"); *Warde*, 151 F.3d at 49 (tipper and tippee engaged in parallel trading of the inside information and "discussed not only the inside information, but also the best way to profit from it"); *United States v. Mylett*, 97 F.3d 663 (2d Cir. 1996) (tippee acquired inside information directly from his insider friend).   We note that the Government has not cited, nor have we found, a single case in which tippees as remote as Newman and Chiasson have been held criminally liable for insider trading.

*Jiau* illustrates the importance of this distinction quite clearly.   In *Jiau*, the panel was presented with the question of whether the evidence at trial was sufficient to prove that the tippers personally benefitted from their disclosure of insider information.   In that context, we summarized the elements of criminal liability as follows:

17a

(1) the insider-tippers . . . were entrusted the duty
to protect confidential information, which (2) they
breached by disclosing [the information] to their
tippee . . . , who (3) knew of [the tippers'] duty and
(4) still used the information to trade a security or
further tip the information for [the tippee's] benefit,
and finally (5) the insider-tippers benefited in some
way from their disclosure.

*Jiau*, 734 F.3d at 152-53 (citing *Dirks*, 463 U.S. at 659-
64; *Obus*, 693 F. 3d at 289).   The Government relies
on this language to argue that *Jiau* is merely the most
recent in a string of cases in which this Court has
found that a tippee, in order to be criminally liable for
insider trading, need know only that an insider-tipper
disclosed information in breach of a duty of confidenti-
ality.   Gov't Br. 43.   However, we reject the Govern-
ment's position that our cursory recitation of the ele-
ments in *Jiau* suggests that criminal liability may be
imposed on a defendant based only on knowledge of a
breach of a duty of confidentiality.   In *Jiau*, the de-
fendant knew about the benefit because she provided
it.   For that reason, we had no need to reach the
question of whether knowledge of a breach requires
that a tippee know that a personal benefit was provid-
ed to the tipper.

In light of *Dirks*, we find no support for the Gov-
ernment's contention that knowledge of a breach of the
duty of confidentiality without knowledge of the per-
sonal benefit is sufficient to impose criminal liability.
Although the Government might like the law to be dif-

18a

ferent, nothing in the law requires a symmetry of information in the nation's securities markets. The Supreme Court explicitly repudiated this premise not only in *Dirks*, but in a predecessor case, *Chiarella v. United States*. In *Chiarella*, the Supreme Court rejected this Circuit's conclusion that "the federal securities laws have created a system providing equal access to information necessary for reasoned and intelligent investment decisions . . . . because [material nonpublic] information gives certain buyers or sellers an unfair advantage over less informed buyers and sellers." 445 U.S. at 232. The Supreme Court emphasized that "[t]his reasoning suffers from [a] defect. . . . [because] not every instance of financial unfairness constitutes fraudulent activity under § 10(b)." *Id.* *See also United States v. Chestman*, 947 F.2d 551, 578 (2d Cir. 1991) (Winter, J., concurring) ("[The policy rationale [for prohibiting insider trading] stops well short of prohibiting all trading on material nonpublic information. Efficient capital markets depend on the protection of property rights in information. However, they also require that persons who acquire and act on information about companies be able to profit from the information they generate . . . ."). Thus, in both *Chiarella* and *Dirks*, the Supreme Court affirmatively established that insider trading liability is based on breaches of fiduciary duty, not on informational asymmetries. This is a critical limitation on insider trading liability that protects a corporation's interests in confidentiality while promoting efficiency in the nation's securities markets.

19a

As noted above, *Dirks* clearly defines a breach of fiduciary duty as a breach of the duty of confidentiality in exchange for a personal benefit. *See Dirks*, 463 U.S. at 662.   Accordingly, we conclude that a tippee's knowledge of the insider's breach necessarily requires knowledge that the insider disclosed confidential information in exchange for personal benefit.   In reaching this conclusion, we join every other district court to our knowledge—apart from Judge Sullivan[3]—that has confronted this question.   *Compare United States v. Rengan Rajaratnam*, No. 13-211 (S.D.N.Y. July 1, 2014) (Buchwald, *J.*); *United States v. Martoma*, No. 12-973 (S.D.N.Y. Feb. 4, 2014) (Gardephe, *J.*); *United States v. Whitman*, 904 F. Supp. 2d 363, 371 (S.D.N.Y. 2012) (Rakoff, *J.*); *United States v. Raj Rajaratnam*, 802 F. Supp. 2d 491, 499 (S.D.N.Y. 2011) (Holwell, *J.*); *State Teachers Retirement Bd. v. Fluor Corp.*, 592 F. Supp. 592, 594 (S.D.N.Y. 1984) (Sweet, *J.*),[4] *with Uni-*

---

[3]  Although the Government argues that district court decisions in *S.E.C. v. Thrasher*, 152 F. Supp. 2d 291 (S.D.N.Y. 2001) and *S.E.C. v. Musella*, 678 F. Supp. 1060 (S.D.N.Y. 1998) support their position, these cases merely stand for the unremarkable proposition that a tippee does not need to know the details of the insider's disclosure of information.   The district courts determined that the tippee did not have to know for certain how information was disclosed, *Thrasher*, 152 F. Supp. 2d at 304-05, nor the identity of the insiders, *Musella*, 678 F. Supp. at 1062-63.   This is not inconsistent with a requirement that a defendant tippee understands that some benefit is being provided in return for the information.

[4]  *See also United States v. Santoro*, 647 F. Supp. 153, 170-71 (E.D.N.Y. 1986) ("An allegation that the tippee knew of the tipper's breach necessarily charges that the tippee knew that the tipper

20a

ted States v. Steinberg, No. 12-121, 2014 WL 2011685 at *5 (S.D.N.Y. May 15, 2014) (Sullivan, *J.*), and *United States v. Newman*, No. 12-121 (S.D.N.Y. Dec. 6, 2012) (Sullivan, *J.*).[5]

Our conclusion also comports with well-settled principles of substantive criminal law.   As the Supreme Court explained in *Staples v. United States*, 511 U.S. 600, 605 (1994), under the common law, *mens rea*, which requires that the defendant know the facts that make his conduct illegal, is a necessary element in every crime.   Such a requirement is particularly appropriate in insider trading cases where we have acknowledged "it is easy to imagine a . . . trader who receives a tip and is unaware that his conduct was illegal and therefore wrongful."   *United States v. Kaiser*, 609 F.3d 556, 569 (2d Cir. 2010).   This is also a statutory

---

was acting for personal gain.") *rev'd on other grounds sub nom.* *United States v. Davidoff*, 845 F.2d 1151 (2d Cir. 1988); *Hernandez v. United States*, 450 F. Supp. 2d 1112, 1118 (C.D. Cal. 2006) ("[U]nder the standard set forth in *Dirks*" a tippee can be liable under Section 10(b) and Rule 10(b)-5 "if the tippee had knowledge of the insider-tipper's personal gain.").

[5]   We note that Judge Sullivan had an opportunity to address the issue in *Steinberg* only because the Government chose to charge Matthew Steinberg in the same criminal case as Newman and Chiasson by filing a superseding indictment.   Notably, the Government superseded to add Steinberg on March 29, 2013, after the conclusion of the *Newman* trial, after Judge Sullivan refused to give the defendants' requested charge on scienter now at issue on this appeal, and at a time when there was no possibility of a joint trial with the *Newman* defendants.

21a

requirement, because only willful" violations are sub-
ject to criminal provision. *See United States v. Tem-
ple*, 447 F.3d 130, 137 (2d Cir. 2006) ("'Willful' re-
peatedly has been defined in the criminal context as
intentional, purposeful, and voluntary, as distinguished
from accidental or negligent").

In sum, we hold that to sustain an insider trading
conviction against a tippee, the Government must
prove each of the following elements beyond a reason-
able doubt:   that (1) the corporate insider was en-
trusted with a fiduciary duty; (2) the corporate insider
breached his fiduciary duty by (a) disclosing confiden-
tial information to a tippee (b) in exchange for a per-
sonal benefit; (3) the tippee knew of the tipper's
breach, that is, he knew the information was confiden-
tial and divulged for personal benefit; and (4) the tip-
pee still used that information to trade in a security or
tip another individual for personal benefit. *See Jiau*,
734 F.3d at 152-53; *Dirks*, 463 U.S. at 659-64.

In view of this conclusion, we find, reviewing the
charge as a whole, *United States v. Mitchell*, 328 F.3d
77, 82 (2d Cir. 2003), that the district court's instruc-
tion failed to accurately advise the jury of the law.
The district court charged the jury that the Govern-
ment had to prove:   (1) that the insiders had a "fidu-
ciary or other relationship of trust and confidence"
with their corporations; (2) that they "breached that
duty of trust and confidence by disclosing material,
nonpublic information"; (3) that they "personally ben-
efited in some way" from the disclosure; (4) "that the

22a

defendant . . . knew the information he obtained had been disclosed in breach of a duty"; and (5) that the defendant used the information to purchase a security. Under these instructions, a reasonable juror might have concluded that a defendant could be criminally liable for insider trading merely if such defendant knew that an insider had divulged information that was required to be kept confidential.   But a breach of the duty of confidentiality is not fraudulent unless the tipper acts for personal benefit, that is to say, there is no breach unless the tipper "is in effect selling the information to its recipient for cash, reciprocal information, or other things of value for himself. . . ." *Dirks*, 463 U.S. at 664 (quotation omitted).   Thus, the district court was required to instruct the jury that the Government had to prove beyond a reasonable doubt that Newman and Chiasson knew that the tippers received a personal benefit for their disclosure.

The Government argues that any possible instructional error was harmless because the jury could have found that Newman and Chiasson inferred from the circumstances that some benefit was provided to (or anticipated by) the insiders.   Gov't Br. 60.   We disagree.

An instructional error is harmless only if the Government demonstrates that it is "clear beyond a reasonable doubt that a rational jury would have found the defendant guilty absent the error[.]"   *Neder v. United States*, 527 U.S. 1, 17-18 (1999); *accord Moran-Toala*, 726 F.3d at 345; *United States v. Quattrone*, 441

23a

F.3d 153, 180 (2d Cir. 2006).   The harmless error inquiry requires us to view whether the evidence introduced was "uncontested and supported by overwhelming evidence" such that it is "clear beyond a reasonable doubt that a rational jury would have found the defendant guilty absent the error."   *Neder*, 527 U.S. at 18.   Here both Chiasson and Newman contested their knowledge of any benefit received by the tippers and, in fact, elicited evidence sufficient to support a contrary finding.   Moreover, we conclude that the Government's evidence of any personal benefit received by the insiders was insufficient to establish tipper liability from which Chiasson and Newman's purported tippee liability would derive.

III.   Insufficiency of the Evidence

As a general matter, a defendant challenging the sufficiency of the evidence bears a heavy burden, as the standard of review is exceedingly deferential. *United States v. Coplan*, 703 F.3d 46, 62 (2d Cir. 2012). Specifically, we "must view the evidence in the light most favorable to the Government, crediting every inference that could have been drawn in the Government's favor, and deferring to the jury's assessment of witness credibility and its assessment of the weight of the evidence."   *Id.*   (citing *United States v. Chavez*, 549 F.3d 119, 124 (2d Cir. 2008)).   Although sufficiency review is *de novo*, we will uphold the judgments of conviction if "any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."   *Id.* (citing *United States v. Yannotti*, 541

24a

F.3d 112, 120 (2d Cir. 2008) (emphasis omitted); *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)). This standard of review draws no distinction between direct and circumstantial evidence. The Government is entitled to prove its case solely through circumstantial evidence, provided, of course, that the Government still demonstrates each element of the charged offense beyond a reasonable doubt. *United States v. Lorenzo*, 534 F.3d 153, 159 (2d Cir. 2008).

However, if the evidence "is nonexistent or so meager," *United States v. Guadagna*, 183 F.3d 122, 130 (2d Cir. 1999), such that it "gives equal or nearly equal circumstantial support to a theory of guilt and a theory of innocence, then a reasonable jury must necessarily entertain a reasonable doubt," *Cassese*, 428 F.3d at 99. Because few events in the life of an individual are more important than a criminal conviction, we continue to consider the "beyond a reasonable doubt" requirement with utmost seriousness. *Cassese*, 428 F.3d at 102. Here, we find that the Government's evidence failed to reach that threshold, even when viewed in the light most favorable to it.

The circumstantial evidence in this case was simply too thin to warrant the inference that the corporate insiders received any personal benefit in exchange for their tips. As to the Dell tips, the Government established that Goyal and Ray were not "close" friends, but had known each other for years, having both attended business school and worked at Dell together. Further, Ray, who wanted to become a Wall Street analyst

25a

like Goyal, sought career advice and assistance from
Goyal.   The evidence further showed that Goyal ad-
vised Ray on a range of topics, from discussing the
qualifying examination in order to become a financial
analyst to editing Ray's résumé and sending it to a
Wall Street recruiter, and that some of this assistance
began before Ray began to provide tips about Dell's
earnings.   The evidence also established that Lim and
Choi were "family friends" that had met through
church and occasionally socialized together.   The
Government argues that these facts were sufficient to
prove that the tippers derived some benefit from the
tip.   We disagree.   If this was a "benefit," practically
anything would qualify.

We have observed that "[p]ersonal benefit is broad-
ly defined to include not only pecuniary gain, but also,
*inter alia*, any reputational benefit that will translate
into future earnings and the benefit one would obtain
from simply making a gift of confidential information
to a trading relative or friend."   *Jiau*, 734 F. 3d at 153
(internal citations, alterations, and quotation marks
deleted).   This standard, although permissive, does
not suggest that the Government may prove the re-
ceipt of a personal benefit by the mere fact of a friend-
ship, particularly of a casual or social nature.   If that
were true, and the Government was allowed to meet its
burden by proving that two individuals were alumni of
the same school or attended the same church, the per-
sonal benefit requirement would be a nullity.   To the
extent *Dirks* suggests that a personal benefit may be

26a

inferred from a personal relationship between the tipper and tippee, where the tippee's trades "resemble trading by the insider himself followed by a gift of the profits to the recipient," *see* 643 U.S. at 664, we hold that such an inference is impermissible in the absence of proof of a meaningfully close personal relationship that generates an exchange that is objective, consequential, and represents at least a potential gain of a pecuniary or similarly valuable nature.   In other words, as Judge Walker noted in *Jiau*, this requires evidence of "a relationship between the insider and the recipient that suggests a *quid pro quo* from the latter, or an intention to benefit the [latter]."   *Jiau*, 734 F. 3d at 153.

While our case law at times emphasizes language from *Dirks* indicating that the tipper's gain need not be *immediately* pecuniary, it does not erode the fundamental insight that, in order to form the basis for a fraudulent breach, the personal benefit received in exchange for confidential information must be of some consequence.   For example, in *Jiau*, we noted that at least one of the corporate insiders received something more than the ephemeral benefit of the "value[] [of] [Jiau's] friendship" because he also obtained access to an investment club where stock tips and insight were routinely discussed.   *Id.*   Thus, by joining the investment club, the tipper entered into a relationship of *quid quo pro* with Jiau, and therefore had the opportunity to access information that could yield future pecuniary gain.   *Id*; *see also SEC v. Yun*, 327 F.3d

27a

1263, 1280 (11th Cir. 2003) (finding evidence of personal benefit where tipper and tippee worked closely together in real estate deals and commonly split commissions on various real estate transactions); *SEC v. Sargent*, 229 F.3d 68, 77 (1st Cir. 2000) (finding evidence of personal benefit when the tipper passed information to a friend who referred others to the tipper for dental work).

Here the "career advice" that Goyal gave Ray, the Dell tipper, was little more than the encouragement one would generally expect of a fellow alumnus or casual acquaintance. *See, e.g.*, J.A. 2080 (offering "minor suggestions" on a resume), J.A. 2082 (offering advice prior to an informational interview). Crucially, Goyal testified that he would have given Ray advice without receiving information because he routinely did so for industry colleagues. Although the Government argues that the jury could have reasonably inferred from the evidence that Ray and Goyal swapped career advice for inside information, Ray himself disavowed that any such *quid pro quo* existed. Further, the evidence showed Goyal began giving Ray "career advice" over a year before Ray began providing any insider information. Tr. 1514. Thus, it would not be possible under the circumstances for a jury in a criminal trial to find beyond a reasonable doubt that Ray received a personal benefit in exchange for the disclosure of confidential information. *See, e.g.*, *United States v. D'Amato*, 39 F.3d 1249, 1256 (2d Cir. 1994) (evidence must be sufficient to "reasonably infer" guilt).

28a

The evidence of personal benefit was even more scant in the NVIDIA chain.   Choi and Lim were merely casual acquantances.   The evidence did not establish a history of loans or personal favors between the two.   During cross examination, Lim testified that he did not provide anything of value to Choi in exchange for the information.   Tr. 3067-68.   Lim further testified that Choi did not know that Lim was trading NVIDIA stock (and in fact for the relevant period Lim did not trade stock), thus undermining any inference that Choi intended to make a "gift" of the profits earned on any transaction based on confidential information.

Even assuming that the scant evidence described above was sufficient to permit the inference of a personal benefit, which we conclude it was not, the Government presented absolutely no testimony or any other evidence that Newman and Chiasson knew that they were trading on information obtained from insiders, or that those insiders received any benefit in exchange for such disclosures, or even that Newman and Chiasson consciously avoided learning of these facts. As discussed above, the Government is required to prove beyond a reasonable doubt that Newman and Chiasson knew that the insiders received a personal benefit in exchange for disclosing confidential information.

It is largely uncontroverted that Chiasson and Newman, and even their analysts, who testified as cooperating witnesses for the Government, knew next

29a

to nothing about the insiders and nothing about what, if any, personal benefit had been provided to them. Adondakis said that he did not know what the relationship between the insider and the first-level tippee was, nor was he aware of any personal benefits exchanged for the information, nor did he communicate any such information to Chiasson. Adondakis testified that he merely told Chiasson that Goyal "was talking to someone within Dell," and that a friend of a friend of Tortora's would be getting NVIDIA information. Tr. 1708, 1878. Adondakis further testified that he did not specifically tell Chiasson that the source of the NVIDIA information worked at NVIDIA. Similarly, Tortora testified that, while he was aware Goyal received information from someone at Dell who had access to "overall" financial numbers, he was not aware of the insider's name, or position, or the circumstances of how Goyal obtained the information. Tortora further testified that he did not know whether Choi received a personal benefit for disclosing inside information regarding NVIDIA.

The Government now invites us to conclude that the jury could have found that the appellants knew that the insiders disclosed the information "for some personal reason rather than for no reason at all." Gov't Br. 65. But the Supreme Court affirmatively rejected the premise that a tipper who discloses confidential information necessarily does so to receive a personal benefit. *See Dirks*, 463 U.S. at 661-62 ("All disclosures of confidential corporate information are not inconsistent

30a

with the duty insiders owe to shareholders"). More-over, it is inconceivable that a jury could conclude, beyond a reasonable doubt, that Newman and Chiasson were aware of a personal benefit, when Adondakis and Tortora, who were more intimately involved in the insider trading scheme as part of the "corrupt" analyst group, disavowed any such knowledge.

Alternatively, the Government contends that the specificity, timing, and frequency of the updates provided to Newman and Chiasson about Dell and NVIDIA were so "overwhelmingly suspicious" that they warranted various material inferences that could support a guilty verdict.   Gov't Br. 65.   Newman and Chiasson received four updates on Dell's earnings numbers in the weeks leading up to its August 2008 earnings announcement.   Similarly, Newman and Chiasson received multiple updates on NVIDIA's earnings numbers between the close of the quarter and the company's earnings announcement.   The Government argues that given the detailed nature and accuracy of these updates, Newman and Chiasson must have known, or deliberately avoided knowing, that the information originated with corporate insiders, *and* that those insiders disclosed the information in exchange for a personal benefit.   We disagree.

Even viewed in the light most favorable to the Government, the evidence presented at trial undermined the inference of knowledge in several ways.   The evidence established that analysts at hedge funds routinely estimate metrics such as revenue, gross

31a

margin, operating margin, and earnings per share through legitimate financial modeling using publicly available information and educated assumptions about industry and company trends. For example, on cross-examination, cooperating witness Goyal testified that under his financial model on Dell, when he ran the model in January 2008 without any inside information, he calculated May 2008 quarter results of $16.071 billion revenue, 18.5% gross margin, and $0.38 earnings per share. Tr. 1566. These estimates came very close to Dell's reported earnings of $16.077 billion revenue; 18.4% gross margin, and $0.38 earnings per share. Appellants also elicited testimony from the cooperating witnesses and investor relations associates that analysts routinely solicited information from companies in order to check assumptions in their models in advance of earnings announcements. Goyal testified that he frequently spoke to internal relations departments to run his model by them and ask whether his assumptions were "too high or too low" or in the "ball park," which suggests analysts routinely updated numbers in advance of the earnings announcements. Tr. 1511. Ray's supervisor confirmed that investor relations departments routinely assisted analysts with developing their models

Moreover, the evidence established that NVIDIA and Dell's investor relations personnel routinely "leaked" earnings data in advance of quarterly earnings. Appellants introduced examples in which Dell insiders, including the head of Investor Relations,

32a

Lynn Tyson, selectively disclosed confidential quarterly financial information arguably similar to the inside information disclosed by Ray and Choi to establish relationships with financial firms who might be in a position to buy Dell's stock.   For example, appellants introduced an email Tortora sent Newman summarizing a conversation he had with Tyson in which she suggested "low 12% opex [was] reasonable" for Dell's upcoming quarter and that she was "fairly confident on [operating margin] and [gross margin]."   Tr. 568:18-581:23.

No reasonable jury could have found beyond a reasonable doubt that Newman and Chiasson knew, or deliberately avoided knowing, that the information originated with corporate insiders.   In general, information about a firm's finances could certainly be sufficiently detailed and proprietary to permit the inference that the tippee knew that the information came from an inside source.   But in this case, where the financial information is of a nature regularly and accurately predicted by analyst modeling, and the tippees are several levels removed from the source, the inference that defendants knew, or should have known, that the information originated with a corporate insider is unwarranted.

Moreover, even if detail and specificity could support an inference as to the *nature* of the source, it cannot, without more, permit an inference as to that source's improper *motive* for disclosure.   That is especially true here, where the evidence showed that

33a

corporate insiders at Dell and NVIDIA regularly en-
gaged with analysts and routinely selectively disclosed
the same type of information.   Thus, in light of the
testimony (much of which was adduced from the Gov-
ernment's own witnesses) about the accuracy of the
analysts' estimates and the selective disclosures by the
companies themselves, no rational jury would find that
the tips were so overwhelmingly suspicious that New-
man and Chiasson either knew or consciously avoided
knowing that the information came from corporate in-
siders or that those insiders received any personal
benefit in exchange for the disclosure.

In short, the bare facts in support of the Govern-
ment's theory of the case are as consistent with an in-
ference of innocence as one of guilt.   Where the evi-
dence viewed in the light most favorable to the prose-
cution gives equal or nearly equal circumstantial sup-
port to a theory of innocence as a theory of guilt, that
evidence necessarily fails to establish guilt beyond a
reasonable doubt.   *See United States v. Glenn*, 312
F.3d 58, 70 (2d Cir. 2002).   Because the Government
failed to demonstrate that Newman and Chiasson had
the intent to commit insider trading, it cannot sustain
the convictions on either the substantive insider trad-
ing counts or the conspiracy count.   *United States v.
Gaviria*, 740 F.2d 174, 183 (2d Cir. 1984) ("[W]here the
crime charged is conspiracy, a conviction cannot be
sustained unless the Government establishes beyond a
reasonable doubt that the defendant had the specific
intent to violate the substantive statute.") (internal

34a

quotation marks omitted).   Consequently, we reverse Newman and Chiasson's convictions and remand with instructions to dismiss the indictment as it pertains to them.

## CONCLUSION

For the foregoing reasons, we vacate the convictions and remand for the district court to dismiss the indictment with prejudice as it pertains to Newman and Chiasson.

35a

**APPENDIX B**

UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT

———

Docket Nos. 13-1837(L) and 13-1917(Con)

UNITED STATES OF AMERICA, APPELLEE

*v.*

TODD NEWMAN, ANTHONY CHIASSON,
DEFENDANTS-APPELLANTS

———

**ORDER**

———

At a Stated Term of the United States Court of
Appeals for the Second Circuit, held at the Thurgood
Marshall United States Courthouse, 40 Foley Square,
in the City of New York, on the 3rd day of April, two
thousand fifteen.

———

The United States of America has filed a petition
for panel rehearing, or, in the alternative, for rehear-
ing *en banc*.  The panel that determined the appeal
has considered the request for panel rehearing, and
the active members of the Court have considered the
request for rehearing *en banc*.

36a

IT IS HEREBY ORDERED that the petition is denied.

For the Court:

/s/   CATHERINE O'HAGAN WOLFE
      CATHERINE O'HAGAN WOLFE
      Clerk of Court

[SEAL OMITTED]

37a

## APPENDIX C

1.   15 U.S.C. 78j provides:

**Manipulative and deceptive devices**

It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce or of the mails, or of any facility of any national securities exchange—

(a)(1)   To effect a short sale, or to use or employ any stop-loss order in connection with the purchase or sale, of any security other than a government security, in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.

(2)   Paragraph (1) of this subsection shall not apply to security futures products.

(b) To use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered, or any securities-based swap agreement[1] any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.

---

[1] So in original.   Probably should be followed by a comma.

38a

(c)(1) To effect, accept, or facilitate a transaction involving the loan or borrowing of securities in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.

(2)   Nothing in paragraph (1) may be construed to limit the authority of the appropriate Federal banking agency (as defined in section 1813(q) of title 12), the National Credit Union Administration, or any other Federal department or agency having a responsibility under Federal law to prescribe rules or regulations restricting transactions involving the loan or borrowing of securities in order to protect the safety and soundness of a financial institution or to protect the financial system from systemic risk.

Rules promulgated under subsection (b) of this section that prohibit fraud, manipulation, or insider trading (but not rules imposing or specifying reporting or recordkeeping requirements, procedures, or standards as prophylactic measures against fraud, manipulation, or insider trading), and judicial precedents decided under subsection (b) of this section and rules promulgated thereunder that prohibit fraud, manipulation, or insider trading, shall apply to security-based swap agreements to the same extent as they apply to securities.   Judicial precedents decided under section 77q(a) of this title and sections 78i, 78o, 78p, 78t, and 78u-1 of this title, and judicial precedents decided under applicable rules promulgated under

39a

such sections, shall apply to security-based swap agreements to the same extent as they apply to securities.

2.   15 U.S.C. 78ff provides:

**Penalties**

**(a)  Willful violations; false and misleading statements**

Any person who willfully violates any provision of this chapter (other than section 78dd-1 of this title), or any rule or regulation thereunder the violation of which is made unlawful or the observance of which is required under the terms of this chapter, or any person who willfully and knowingly makes, or causes to be made, any statement in any application, report, or document required to be filed under this chapter or any rule or regulation thereunder or any undertaking contained in a registration statement as provided in subsection (d) of section 78*o* of this title, or by any self-regulatory organization in connection with an application for membership or participation therein or to become associated with a member thereof which statement was false or misleading with respect to any material fact, shall upon conviction be fined not more than $5,000,000, or imprisoned not more than 20 years, or both, except that when such person is a person other than a natural person, a fine not exceeding $25,000,000 may be imposed; but no person shall be subject to imprisonment under this section for the vio-

40a

lation of any rule or regulation if he proves that he had no knowledge of such rule or regulation.

**(b)  Failure to file information, documents, or reports**

Any issuer which fails to file information, documents, or reports required to be filed under subsection (d) of section 78*o* of this title or any rule or regulation thereunder shall forfeit to the United States the sum of $100 for each and every day such failure to file shall continue.  Such forfeiture, which shall be in lieu of any criminal penalty for such failure to file which might be deemed to arise under subsection (a) of this section, shall be payable into the Treasury of the United States and shall be recoverable in a civil suit in the name of the United States.

**(c)  Violations by issuers, officers, directors, stockholders, employees, or agents of issuers**

(1)(A) Any issuer that violates subsection (a) or (g) of section 78dd-1 of this title shall be fined not more than $2,000,000.

(B) Any issuer that violates subsection (a) or (g) of section 78dd-1 of this title shall be subject to a civil penalty of not more than $10,000 imposed in an action brought by the Commission.

(2)(A) Any officer, director, employee, or agent of an issuer, or stockholder acting on behalf of such issuer, who willfully violates subsection (a) or (g) of section 78dd-1 of this title shall be fined not more than $100,000, or imprisoned not more than 5 years, or both.

41a

(B) Any officer, director, employee, or agent of an issuer, or stockholder acting on behalf of such issuer, who violates subsection (a) or (g) of section 78dd-1 of this title shall be subject to a civil penalty of not more than $10,000 imposed in an action brought by the Commission.

(3) Whenever a fine is imposed under paragraph (2) upon any officer, director, employee, agent, or stockholder of an issuer, such fine may not be paid, directly or indirectly, by such issuer.

3.   18 U.S.C. 2 provides:

**Principals**

(a) Whoever commits an offense against the United States or aids, abets, counsels, commands, induces or procures its commission, is punishable as a principal.

(b) Whoever willfully causes an act to be done which if directly performed by him or another would be an offense against the United States, is punishable as a principal.

4.   18 U.S.C. 371 provides:

**Conspiracy to commit offense or to defraud United States**

If two or more persons conspire either to commit any offense against the United States, or to defraud the United States, or any agency thereof in any manner or for

42a

any purpose, and one or more of such persons do any act to effect the object of the conspiracy, each shall be fined under this title or imprisoned not more than five years, or both.

If, however, the offense, the commission of which is the object of the conspiracy, is a misdemeanor only, the punishment for such conspiracy shall not exceed the maximum punishment provided for such misdemeanor.

5.    17 C.F.R. 240.10b-5 provides:

**Employment of manipulative and deceptive devices.**

It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange,

(a)  To employ any device, scheme, or artifice to defraud,

(b)  To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or

(c)  To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

43a

6.   17 C.F.R. 240.10b5-2 provides:

**Duties of trust or confidence in misappropriation insider trading cases.**

PRELIMINARY NOTE TO § 240.10b5-2:  This section provides a non-exclusive definition of circumstances in which a person has a duty of trust or confidence for purposes of the "misappropriation" theory of insider trading under Section 10(b) of the Act and Rule 10b-5.  The law of insider trading is otherwise defined by judicial opinions construing Rule 10b-5, and Rule 10b5-2 does not modify the scope of insider trading law in any other respect.

(a)  *Scope of Rule*.  This section shall apply to any violation of Section 10(b) of the Act (15 U.S.C. 78j(b)) and §240.10b-5 thereunder that is based on the purchase or sale of securities on the basis of, or the communication of, material nonpublic information misappropriated in breach of a duty of trust or confidence.

(b)  *Enumerated* "*duties of trust or confidence*."  For purposes of this section, a "duty of trust or confidence" exists in the following circumstances, among others:

(1)  Whenever a person agrees to maintain information in confidence;

(2)  Whenever the person communicating the material nonpublic information and the person to whom it is communicated have a history, pattern, or practice of sharing confidences, such that the recipient of the information knows or reasonably should know that the person com-

44a

municating the material nonpublic information expects that the recipient will maintain its confidentiality; or

(3)  Whenever a person receives or obtains material nonpublic information from his or her spouse, parent, child, or sibling; *provided*, however, that the person receiving or obtaining the information may demonstrate that no duty of trust or confidence existed with respect to the information, by establishing that he or she neither knew nor reasonably should have known that the person who was the source of the information expected that the person would keep the information confidential, because of the parties' history, pattern, or practice of sharing and maintaining confidences, and because there was no agreement or understanding to maintain the confidentiality of the information.